STATE OF MISSOURI, Respondent, v. CLARENCE CLAYBAUGH, Appellant.

**Kansas City Court of Appeals, November 1, 1909.**

1. **PETIT LARCENY: Criminal Intent.** It is elementary that a criminal intent is the principal element of the offense of larceny whether the offense be grand larceny and, therefore, a felony, or petit larceny a misdemeanor.

2. **THEFT: Unlawful Conversion: Jury.** It is often difficult to distinguish between theft and unlawful conversion. If one takes the property of another and converts it to his own use but takes it in good faith under color of a rightful claim, he is not a thief but an honest wrongdoer and his liability is civil and not criminal, and the issue of whether the accused acted in good faith under color of right is, generally, one of fact for the jury.

3. **COURTS OF APPEAL: Jurisdiction: Misdemeanors.** The Courts of Appeals in their respective districts have jurisdiction of appeals in misdemeanor cases.

4. **EVIDENCE: Criminal Intent.** A consideration of all the evidence discloses no reasonable suggestion of criminal intent on the part of the defendant, and the demurrer should have been sustained. The criminal courts are neither a collection agency nor a forum for the trial of mere disputes over the ownership of property.

Appeal from Grundy Circuit Court.—*Hon. G. W. Wanamaker*, Judge.

REVERSED.

*O. N. Gibson & Hubbell Brothers* for appellant.

*Elliot W. Major* and *James T. Blair* for respondent.

JOHNSON, J.—Defendant was indicted, tried and convicted for petit larceny and was granted an appeal to the Supreme Court but that tribunal transferred the case to this court on jurisdictional grounds. The charge in the indictment is "that Clarence Claybaugh . . . on the — day of December, 1904, at the county of Grundy, State of Missouri, eleven (11) turkeys, the property of W. O. Garnand of the value of $17.50, did unlawfully steal, take and carry away, he the said Clarence Claybaugh then and there having no right or interest in said turkeys," etc. The record is very voluminous. The contest arose between neighboring farmers over the ownership of eleven turkeys and the whole countryside appears to have participated in the trial. This great neighborhood ado must have disconcerted the Court since throughout the trial and particularly in the instructions given the jury, we find the principal ingredient of the offense of larceny, i. e. a criminal intent, was entirely ignored and the cause was tried as though it were one in replevin or for conversion. The one great issue, fought at white heat, was whether the turkeys in controversy were Claybaugh's or Garnand's. The jury, immersed by the evidence in a mass of circumstances and details, emerged with a verdict that the turkeys were Garnand's, and convicted the defendant, a very young man of spotless reputation and the mainstay of his widowed mother.

We shall not attempt to detail the "facts and circumstances." To do so would make this opinion as long as the briefs of counsel and would but serve to confuse. The principal facts thus may be stated: The Claybaughs, Garnands and Renfros, neighboring families, raised turkeys in the year 1904. The Garnand and Renfro broods were hatched by turkey hens and, after the manner of their kind, became nomadic and predatory. They came home at rare intervals and their owners seldom saw them. Most of the Claybaugh turkeys were hatched and mothered

by chicken hens and, under the wise guidance of their mothers, stayed at home and led a purely domestic life. As Thanksgiving Day approached, the Garnands and Renfros began an unsuccessful hunt for their turkeys. Their quest finally led them to the Claybaugh farm where they found that two of the turkeys which, at the time, were roosting high (thieves had made inroads on the flock several nights before), looked like Garnand turkeys (old hens). Mrs. Claybaugh and her son claimed the hens as their property. There were forty-one turkeys in the flock and Mrs. Claybaugh, who had tended the flock all summer, claimed all of them. Some courteous but strained conversation ensued, with the result that the Garnands and Renfros withdrew, with the understanding that the turkeys would not be sold for a few days and that the claimants would return with proof of their claims. The Garnands claimed to own eleven and the Renfros six of the turkeys. Mrs. Claybaugh kept the flock intact for over a week and then, thinking the claimants had abandoned their demands, proceeded to carry out the purpose she had entertained all along to sell the turkeys on the market. Accordingly her son, the defendant, started before daybreak one morning with a load of thirty turkeys and drove to Trenton to sell them. The poultry dealer would give but nine cents a pound—the market price had been eleven cents—and defendant returned home with the turkeys. Afterward, Mrs. Claybaugh learned that a dealer in a small nearby town was paying twelve cents a pound and defendant took a load to that town and sold them to the dealer at that price. The dealer gave defendant a check on the bank for the purchase price and defendant took the check home. Afterward, and within a week, defendant drove two other loads to the same town and sold them to the dealer, each time he surrendered the check previously given him and received a new check for the purchase price of all the

turkeys sold to that time. In this way, Mrs. Claybaugh disposed of the forty-one turkeys.

Now, the dealer had heard in some way that the Garnands and Renfros claimed to own some of these turkeys and he put them all in a pen and telephoned the claimants that he had them. He was notified not to dispose of them until the claimants had an opportunity to appear and claim their property. Accordingly, he stopped payment on the check and advised defendant of what he had done and why he had done it. Defendant, who had refrained from cashing the checks, expressed his satisfaction with the dealer's conduct and at an appointed time, met the Renfros and Garnands at the turkey pen. Defendant offered to settle the controversy, even if it cost him twenty-five dollars, if it could be done in a way that would not amount to a confession that he had done wrong. He insisted that the turkeys belonged to his mother, but was willing to pay for peace. The Garnands and Renfros were obdurate. They demanded unconditional surrender. That is to say, they demanded unconditional orders from defendant on the dealer for the full value of the respective flocks claimed by them. Defendant refused and the negotiations stopped. The identification of their property by the claimants appears to us very vague and unsatisfactory. They did not profess familiarity with the young turkeys. They did identify one old hen on account of the lightness of her color and another by her unusually long and extremely red legs and, by a sort of Sherlock Holmes process of deduction, observing that seventeen of the turkeys a little lighter in color than the others in the pen herded together and would not associate with their darker fellow-prisoners, concluded this exclusive bunch must be their property.

Mr. Garnand was asked why he did not replevin his turkeys or sue somebody for their value and replied that it would be too much trouble and some expense. Afterward the dealer permitted defendant to cash the

check and later, when the grand jury met, an indictment was found against defendant.

It is elementary that a criminal intent is the principal element of the offense of larceny whether the offense be grand larceny and, therefore, a felony, or petit larceny, a misdemeanor. Often it is difficult to draw the line between theft and a mere unlawful conversion. If one takes the property of another and converts it to his own use but takes it in good faith under color of a rightful claim, he is not a thief but an honest wrongdoer, and his liability is civil, not criminal. Generally, the issue of whether the accused acted in good faith under color of right is one of fact for the jury. So frequently in criminal prosecutions for theft a mere pretense of ownership is used by the accused as a screen to a criminal intent that courts will not listen to such assertions where the evidence discloses facts and circumstances tending to show that they are a mere pretense. "If the bare assertion of a claim to stolen goods shall prevent a conviction for larceny there is no protection against the invasion of depredators." [Witt v. State, 9 Mo. 672.] But in such cases, as in all others, it is the province of the court to pass on the question of whether the evidence adduced by the State has enough probative force to raise an issue of fact. If there is no substantial evidence of criminal intent, the court should not send the case to the jury. And in the present case, the evidence is so barren of even a reasonable suggestion of criminal intent that we cannot refrain from expressing our surprise at the action of the learned trial judge in overruling the demurrer to the evidence, and in refusing to set aside a verdict so grossly pervertive of justice. Here we find a young man of unimpeachable character and reputation acting on the word of his mother who was a woman of good character and reputation and in a manner thoroughly considerate of the rights of the claimants. He willingly gave them every opportunity to identify their property

and to bring suit for its recovery or value. There was no attempt at concealment. Everything he did was open and above board. There is no room for any reasonable mind to infer that he harbored a criminal intent. The prosecuting witness had no right to discard his civil remedy and invoke criminal process on account of the trouble and expense a civil suit might cause him. The criminal courts are neither a collection agency nor a forum for the trial of mere disputes over the ownership of property.

The judgment is reversed. All concur.