# CASES DETERMINED

## BY THE

# SUPREME COURT

### OF THE

## STATE OF MISSOURI

### AT THE

## OCTOBER TERM, 1917.

---

### THE STATE v. ALBERT LEE, Appellant.

In Banc, February 9, 1916.*

1. **CRIMINAL INTENT: Presumption: Possession of Property: Corpus Delicti.** The possession by one of the property of another does not raise any presumption, nor is it of itself evidence, that the property was stolen. The possession must be accompanied by other incriminating circumstances, inconsistent with the possessor's innocence. The evidence in this case does not establish beyond a reasonable doubt that the property was stolen or the defendant's guilt.

2. **——: Instruction: Unexplained Possession of Stolen Property.** The purpose of an instruction on the question of the presumption of guilt arising from the recent unexplained possession of stolen property, is to aid in determining the identity of the felonious taker; and where defendant admits that the hog alleged to have been stolen was by his direction taken from the range and placed in his barn by his hired hands, such an instruction should not be given, since the question at issue is not the identity of the taker, but the intent with which the hog was taken.

3. **——: ——: Assuming Property Was Stolen.** Where the issue is whether or not the hog found in defendant's possession was stolen, an instruction which assumes that the hog was stolen is erroneous.

---

*NOTE.—Certified to the Reporter February 5, 1918.

272 Mo.]                    (121)

Appeal from Butler Circuit Court.—*Hon. J. P. Foard,* Judge.

REVERSED AND DEFENDANT DISCHARGED.

, *E. R. Lentz* for appellant.

*John T. Barker,* Attorney-General, and *S. P. Howell,* Assistant Attorney-General, for the State.

WILLIAMS, C.—Under an indictment charging the defendant with stealing six hogs, the property of one Walter Reynolds, the defendant was tried in the circuit court of Butler County, found guilty, and his punishment assessed at two years in the penitentiary. Defendant has duly perfected an appeal to this court.

The evidence upon the part of the State tends to show that Walter Reynolds, the prosecuting witness, lived on a farm about three-fourths of a mile north of the farm upon which the defendant lived, near Neelyville, in Butler County, Missouri. Reynolds owned a small black sow. The sow was marked with a crop and split in the left ear, and an aluminum button, bearing the name of "Walter Reynolds" on one side and "Neelyville, Missouri" on the other side, was fastened in the sow's right ear. This button was about the size of a quarter. The sow was turned out on the range which extended up to defendant's place, and would come up to prosecuting witness's home nearly every day. During the last week in September, 1913, she failed to come up as usual, and Mr. Reynolds did not see her again until October 14, 1913, on which date he found her in defendant's barn. At that time she had five small pigs and was fastened up in a stall in the barn with some other hogs.

It appears that on October 13th, one Bradford and a Mr. Molloy went to defendant's place in search of some missing hogs. They told defendant that they had heard he had some hogs of theirs. Thereupon defendant said, "Come on and I will show you," and

he took them to the barn and showed them the hogs that were fastened in the stall, but they did not find the hogs they were looking for. They noticed a black sow with five pigs in the stall at that time. Defendant said the hogs in the barn belonged to him.

Later, that same day, Bradford and one McClain went back to the farm, but it does not appear that defendant was then present. On the next day, October 14th, Bradford, Molloy and the prosecuting witness and his mother went to defendant's farm, but it does not appear that the defendant was present or that they had any conversation with him. When they reached the barn, Reynolds examined the black sow and, upon raking the mud from her ear, found the aluminum button bearing his name.

Some time later, on that day, the prosecuting witness instituted replevin suit to replevin the sow and returned to defendant's place with the constable and Mr. McClain. It appears that McClain and the prosecuting witness went to the barn, and that the constable went out into the field where he found defendant at work. There the constable served the replevin writ upon the defendant and the defendant said that the hogs did not belong to Reynolds. The officer told defendant that Reynolds had identified the black sow by the aluminum button in her ear, and defendant said, "If that black sow has got Walter Reynolds' button on her ear, I will eat it." Defendant then accompanied the officer to the barn and they scraped the mud off of the sow's ear and showed defendant the button. It does not appear what defendant did or said after that. None of the State's witnesses knew who put the sow in the barn or how long she had been there. They testified that the pigs appeared to be about one week old. Some of the witnesses said that the pen in which the hogs were fastened in the barn was boarded up about four feet and that it was dark in there. Other witnesses described the pen as a stall with the opening boarded up about four feet. The prosecuting witness's

mother testified that she accompanied the men to the barn when they found the sow and pigs in the barn with a lot of other hogs—one of Mr. Abington's, one of Mr. McClain's and one that the witness did not know.

The defendant testified, in his own behalf, that, on October 12th, he owned a black sow which was running loose on the range and that he was expecting her to have pigs. At that time, he had two hired hands working for him, one a "hobo" called Shorty, and the other was Howard Rowe, whose home was somewhere in Arkansas. The defendant, before starting on a trip to Poplar Bluff, told these two hired hands that if the black sow came up that day to put her in the barn, because he was expecting her to have pigs. When he returned from Poplar Bluff, the next day, the hired hands told him that they had put the black sow in the barn and that during the night she had delivered pigs. That when Bradford and Molloy came to his house, on the 13th of October, and inquired for hogs, he took them to the barn and opened the door and showed them the hogs in the barn. The defendant, at that time, saw the black sow and the pigs and supposed they were his, but said that it was a little dark in there and that he did not pay much attention to the hogs at that time, and that he did not know that the black sow was not his until the replevin writ was served on him the next day, at which time he went to the barn with the officer and was shown the button in the sow's ear.

He testified that his sow and the prosecuting witness's sow were about the same size and that his sow had a crop in the left ear and that nobody could have told that the sow he had in the barn belonged to the prosecuting witness until the mud was scraped off her ear, which was the first time that he had information that the sow did not belong to him. Defendant's sow finally came up two or three weeks afterwards without any pigs. He presumed that something had destroyed them. He testified that he did not know where "Shorty" went after he quit working for him, and that Rowe lived somewhere in Arkansas.

State v. Lee.

(It appears that defendant was not indicted until April 24, 1914, some six months after the occurrence. of the alleged offense, and that the trial did not occur till April, 1915, eighteen months after the date of the alleged offense).

Defendant's wife corroborated him in regard to the two hired hands putting the hog in the barn while the defendant was away in Poplar Bluff. Defendant's son Willie also corroborated the defendant and testified further that he had just come home from school and saw Shorty and the other hired hand driving the black sow around to the barn door and that she did not have pigs at that time. The son also heard "Shorty" tell defendant, at breakfast the next morning, that they had put the black sow up.

In rebuttal, the prosecuting witness testified that he never saw "Shorty" or Rowe about the place. Witnesses Molloy and Bradford testified that they had been around defendant's place about four times in October, but that at none of those times had they seen "Shorty" or Rowe working there. Upon cross-examination, they admitted that "Shorty" and Rowe might have been working for the defendant on those occasions and they had failed to see them, and admitted that on one or two occasions they had been to defendant's place and had not seen him there.

Instruction Number 6, given on behalf of the State, was as follows:

"If the jury believe from the evidence that soon after the commission of the offense charged in the indictment, if you believe from the evidence an offense was committed, the property taken at the time of commission of the offense was found in the possession of the defendant, such possession is presumptive evidence of the defendant's guilt, and if such possession of such stolen property is not satisfactorily explained by defendant, it will be conclusive evidence of his guilt; and the jury are further instructed that it devolves on the defendant to explain such possession."

I. Appellant contends that there was not sufficient proof of the *corpus delicti* and that, therefore, the evidence was insufficient to support the verdict. We think this point well taken. The facts shown by the testimony are stated fully in the foregoing statement and it becomes, therefore, unnecessary to restate the same in detail here. In substance the evidence discloses that the defendant was found in possession of a hog which belonged to the prosecuting witness, and which, prior to that time, had been running at large on the range which extended from the home of the prosecuting witness to that of the defendant. Defendant's evidence tended to show that the hog was similar in description to one of his own upon the range and was, by his two employees, placed in the barn under the mistaken belief that it was the property of defendant.

Presumption Arising from Possession.

The mere fact that the hog disappeared from the range would not be sufficient proof that the hog was feloniously taken therefrom—this, because it is a matter of common knowledge that stock running out upon the range, in common with other stock, may disappear therefrom by becoming mixed up with the other stock and follow it off, or by being driven off by mistake, just as readily as it may be feloniously taken therefrom, and the mere proof of disappearance from the range would not, in and of itself, justify the presumption that it had been stolen. And the further fact that the hog was afterwards found in defendant's possession would also fail to prove that the hog had been stolen. The possession by one of the property of another does not raise any presumption that the property was stolen. The correct rule in this regard is stated as follows: "The possession of property does not of itself raise any presumption, nor is it indeed any evidence, that the property was stolen. There must be other evidence of the *corpus delicti*." [8 Ency. of Evidence, pages 99-100, and cases therein cited.]

The disappearance of the hog from the range and the subsequent finding of same in possession of the de-

fendant would, no doubt, furnish material for links in a chain of circumstantial evidence, if they were accompanied by other incriminating circumstances. But the necessary incriminating circumstances are here absent. The conduct of the defendant at each time he was questioned about the hogs was not that of a man trying to conceal, and therefore the conduct of a guilty man, but he showed, at all times, a ready willingness to have the hogs seen and examined. The facts disclosed are not inconsistent with the theory of defendant's innocence. Very appropriate to the situation here is the following language of the Court of Appeals of New York in Mc-Court v. People, 64 N. Y. 583, l. c. 586-7, to-wit:

"Whether the criminal intent existed in the mind of a person accused of crime at the time of the commission of the alleged criminal act, must of necessity be inferred and found from other facts which in their nature are the subject of specific proof; and for this reason it is, that the other constituents of the crime being proved, it must, ordinarily, be left to the jury to determine, from all the circumstances, whether the criminal intent existed.

"In some cases the inference is irresistible, and in others it may be, and often is, a matter of great difficulty to determine whether the accused committed the act charged with a criminal purpose. But there are usually found in connection with an act done, which is charged to be criminal, attending circumstances which characterize it, and if these are absent, or the circumstances proved are consistent with innocence, a conviction cannot be safely allowed."

It does not appear that the prosecuting witness had any conversation with defendant prior to the time the writ of replevin was served, and judging from the conduct of defendant when questioned by Bradford and Molloy, concerning the lost hogs of Bradford, it would appear that the prosecuting witness could easily have obtained possession of his hog had he gone to defendant and made his claim instead of going to the trouble of bringing a suit in replevin. While it is true that

defendant's conduct does not, necessarily, establish his innocence, yet the same may be mentioned for the purpose of showing that it contained nothing incriminating. The burden was upon the State to establish defendant's guilt and not upon the defendant to establish his innocence. The evidence at most can only be said to raise a suspicion of guilt against the defendant, but suspicion, alone, is never sufficient to support a verdict. [State v. Jones, 106 Mo. 302; State v. Morney, 196 Mo. 43; State v. Ruckman, 253 Mo. 487.]

After carefully considering the evidence in all of its phases, we have reached the conclusion that it falls short of the *quantum* of proof which would justify the triers of fact in finding, beyond a reasonable doubt, that the defendant is guilty. [State v. Counts, 234 Mo. 580; State v. Claybaugh, 138 Mo. App. 360, l. c. 364; State v. Bass, 251 Mo. 107.]

II. The court erred in giving said instruction numbered 6, on the question of the presumption of guilt arising from the recent unexplained possession of stolen property. In this case, defendant admitted that the hog was taken from the range and placed in his barn, by reason of his orders to his two employees. The question at issue, therefore, was not the identity of the person who took the hog, but the intent with which the hog was taken—whether innocently or feloniously taken. Under such conditions this instruction (the function of which is to aid only in determining the identity of the felonious taker, State v. Warden, 94 Mo. 648, l. c. 652) should not have been given. [State v. Christian, 253 Mo. 382, l. c. 396.]

The instruction is also subject to criticism in another respect, viz., in one portion of the instruction it assumes that the property was stolen. In a case where there was no dispute concerning the State's claim that the property in question had been stolen, this assumption would, perhaps, not be considered as harmful, but in a case, like the present, where that issue is a contested one, the assumption of that fact in the in-

struction would, no doubt, work serious injury to the rights of the defendant.

The judgment is reversed and the defendant discharged.

*Roy, C.,* concurs.

PER CURIAM: The above cause coming into Court in Banc, the opinion therein by WILLIAMS, C., is modified and adopted. *Woodson, C. J.,* and *Graves, Walker, Faris* and *Blair, JJ.,* concur; *Bond* and *Revelle, JJ.,* dissent.