## THE STATE v. WILLIAM SINGLETON, Appellant.

Division Two, June 8, 1922.

1. CRIMINAL LAW: Proof of Corpus Delicti: Circumstantial Evidence. In a prosecution for assault with intent to kill, by shooting with a gun, where there was direct evidence of the shooting by some one, and it was sought to show, by circumstantial evidence, that defendant was the one who did the shooting, it was necessary, in order to sustain a conviction, that the circumstances proved should be consistent with the hypothesis that defendant was guilty and at the same time inconsistent with the hypothesis that he was innocent, and with every other rational hypothesis except that of his guilt.

2. ———: ———: ———: Presumption of Innocence. In considering the sufficiency of circumstantial evidence to sustain a conviction for assault with intent to kill, the rule of law that defendant is presumed to be innocent and that this presumption attends him throughout the trial, must be taken into account, and particularly in a case, such as this, where defendant's general reputation for being a peaceable and quiet citizen was shown to be good.

3. ———: ———: ——— Proof of Motive. Notwithstanding the fact that there is sufficient evidence to establish a motive, on the part of defendant, for the commission of the crime charged, thereby furnishing one link in the chain of circumstances tending to establish guilt, yet the mere showing of motive, uncorroborated by other facts and circumstances inconsistent with innocence, is not a sufficient prima-facie showing to authorize the submission of defendant's guilt to the jury.

4. ———: ———: ———: Conjecture and Speculation. Where the evidence relied upon to establish defendant's connection with the felony charged against him is wholly circumstantial and merely

conjectural and speculative in character, it is insufficient to sustain a conviction, and his demurrer to the evidence, at the conclusion of the whole case, should be sustained.

5. ————: **Judgment Reversed and Defendant Discharged.** As all the parties who probably knew anything about the facts in this case testified as witnesses at the trial, there appears to be no good reason for remanding the case for another trial, and hence the judgment is reversed and the defendant discharged.

Appeal from Livingston Circuit Court.—*Hon. Arch. B. Davis,* Judge.

REVERSED.

*Scott J. Miller* for appellant.

There is absolutely no evidence to support the verdict and case should be reversed. State v. Jones, 106 Mo. 309; State v. Morney, 196 Mo. 51; State v. Buckman, 253 Mo. 498.

*Jesse W. Barrett,* Attorney-General, and *Henry Davis,* Assistant Attorney-General, for respondent.

(1) Where a mass of testimony is offered, some of which is competent and a part of which is incompetent, no error is committed in overruling an objection which is leveled at the whole of it. State v. Johnson, 76 Mo. 124. (a) Articles found at the scene of a crime are always admissible in evidence. State v. Hopkins, 278 Mo. 394. (b) Articles which are shown by the evidence to be connected with the crime or which serve to unfold or explain it may' be exhibited in evidence. 16 C. J. 618; State v. Goddard, 146 Mo. 184; State v. Looney, 204 S. W. 25. (c) Evidence of the footprints made at the scene of the crime, the measurements thereof and a description and identification of the shoes of appellant was competent. State v. Rasco, 239 Mo. 569. (d) Where a defendant is cross-examined beyond the range of his examination in chief as to matters testified to by

other witnesses produced by him and where such evidence has no tendency to prove his guilt, the error is of the harmless variety. State v. Barrington, 198 Mo. 81; State v. Feeley, 194 Mo. 316; State v. Gatlin, 170 Mo. 371. (e) It was competent to show that appellant had trouble with his wife and the prosecuting witness as showing the motive for the crime. Comm. v. Kennedy, 170 Mass. 18; State v. Turner, 246 Mo. 617; State v. Rasco, 239 Mo. 564; State v. McNamara, 212 Mo. 150. (f) That a defendant lived within a short distance of the scene of a crime, knew of its commission and did not go there is competent as tending to prove consciousness of guilt. State v. Glasscock, 232 Mo. 292. (g) The shoes owned by appellant were properly admitted in evidence, although it was not shown that he wore them on the night of the tragedy. State v. Rasco, 239 Mo. 578. (h) It was proper to admit evidence of threats made by appellant against the assaulted person. All declarations of personal hostility are admissible in evidence. State v. Talbott, 73 Mo. 360; State v. Pollard, 132 Mo. 295; State v. Wright, 141 Mo. 337; State v. Turner, 246 Mo. 604, 617.

RAILEY, C.—On March 4, 1921, the Prosecuting Attorney of Livingston County, Missouri, filed an information in the circuit court of said county, charging defendant with having feloniously, etc., shot one Leo Ramsey in said county, on December 31, 1920. Defendant was duly arraigned and entered a plea of not guilty. He was tried before a jury and, on April 5, 1921, the latter returned into court the following verdict:

"We, the jury, find the defendant guilty as charged in the information and assess his punishment at four (4) years' imprisonment in the State Penitentiary.

"A. E. Cox, Foreman."

As defendant is strenuously insisting here that his demurrer to the evidence at the conclusion of the whole case should have been sustained, we will set out fully the testimony as shown by the record.

Alec Cleveland, testified, in substance, that he had
known Leo Ramsey about one year and Ramsey's wife
five or six years; that on the afternoon of December 31,
1920, about four or five o'clock p. m., Leo Ramsey came
to the residence of witness at Bedford, in Livingston
County, and had been there three or four hours before
he was shot; that Ramsey and wife ate supper with wit-
ness, and as soon as the meal was over, they commenced
playing a game of "pitch;" that four of the parties
were sitting in a square, playing cards; that Ramsey
was facing southwest; that witness was facing Ramsey,
and the wife of witness was facing Mrs. Ramsey on the
west side; that said game was started shortly after
seven o'clock, and they had been playing five or ten
minutes before Ramsey was shot; that the explosion
came from the front door in the southeast corner of the
house; that the wife of witness was leaning over, and
the shot passed over her shoulder, striking the back of
her rocking chair, and part of the shot struck Leo Ram-
sey in the full side of his face; that the shot tore a hole
through the screen of the door, about two inches in
diameter; that the room was about seventeen feet and
six inches long, and about fourteen feet and eight inches
wide; that it was a dark, foggy night, had been raining
some, and the ground was very muddy and soft; that
several people soon gathered at the house of witness,
after the shooting; that sixteen of the shot went through
the back of the chair, and they looked like number six
shot; that defendant was not at the house of witness
that evening; that after the shooting, as witness went
to town, he passed defendant's house and did not see
any light, nor did he see defendant.

On cross-examination, witness said the main part of
Bedford was southeast from his house; that the latter
was located on the north side of a street running east
and west, and the river was right north of the house;
that the front door of his house was about thirty or
forty feet from the street; that there was a picket fence
and gate, next to the street, and a concrete walk run-

ning from the gate to the house; that the river was about one hundred feet north of the house, and the banks along same were high; that there was a chicken wire fence between the house and river on the north, and there were two small gates opening through same; that it was about three hundred feet from his house to the Grand River bridge on the east; that there was a roadway between the house of witness and the main road that crosses said bridge; that the street is open to the river, but is not traveled much; that there was a barbedwire fence on the east side of his house; that the ground east of the house had been plowed, and was not frozen on December 31st; that the shooting occurred between 7:20 and 7:30 p. m.

On re-examination, witness testified that Norris's house was east and on the same side of the street as his own, and both face south; that defendant lived across the street from Norris and on the east side of the street running south from the bridge; that if his wife had not leaned forward, some of the shot would have struck her.

Leo Ramsey testified that he lived at Kansas City, Missouri; that defendant was the step-father of witness's wife; that they had been married a little more than a year; that they were living at Salina, Kansas, when married; that he got to Bedford on the afternoon of December 31st, about 3:30 o'clock; that he had been in Bedford about three weeks before, to see his wife; that he was only slightly acquainted with defendant; that he did not see defendant on the day of the shooting. Witness corroborates the testimony of Cleveland, as to what occurred at the latter's house, and in regard to the surroundings up to the time of the shooting. He testified that one eye was shot out, his face sprinkled with shot, etc.; that on his former visit to Bedford he was at defendant's home a few minutes; that his wife, mother and children were there.

Ike Jamison, the constable of the township where Bedford is located, testified that he had known defendant about twenty-five years; that prior to December 31st

he had talked with him twice; that about two weeks before the shooting, he went to defendant's house, at the latter's request, and while there appellant told him he was expecting Ramsey and wife, defendant's wife and the Greenwall children, to come and take his furniture from the house; that he expected them to come with a writ of replevin, or by force, and if they came, he wanted witness to come to his house and keep the peace; that he did not want them there, was going to keep them off, and wanted to know if witness would come down and keep the peace; that witness agreed to come if it was handy; that defendant told him a good deal about his wife's troubles, and his own.

Over the objection of defendant, witness was permitted to testify that defendant said, "that d—— outfit was giving him a whole lot of trouble and giving him h—— awhile," and he wanted to give them a little now. He said if they came with a writ of replevin to be d—— sure they had a good bond, because he was going to file him a case; that he told Ashby he had a good poker and could use it. He said Ramsey's wife had showed his wife some bad pictures. He said, that d—— s—— of a b—— was trying to get his wife and her two daughters to go with him somewhere and set up an ill-fame house, and that if he could get the women to go with him, he would have slick sliding without work; that at the instance of defendant, about one week later, witness went to the home of appellant, where he, defendant, and the latter's father, were alone. He said defendant asked him what that s—— of a b—— wanted at the house of witness that evening (speaking of Leo Ramsey), and witness told him Ramsey was not there; that defendant and his father said, it was a d——n "onery" outfit, and they all ought to be run out of the country; that defendant's father said they ought to take a shotgun and blow their d——n heads off and Cleveland's wife; that defendant said, that is just what ought to be done; that on January 1st, defendant called him to his fence, as witness was passing by, and asked him how

Ramsey was; that he told defendant Ramsey was in a bad shape, and defendant asked him if they had any clue as to who did it, and witness told defendant the evidence would be pretty strong against him; that defendant said, it didn't surprise him a d——n bit. Witness then went in the house, and with the consent of defendant examined the latter's gun; that he went away and came back to defendant's house, where the latter's father asked witness who they suspicioned, and he told him they suspicioned this defendant; that witness, with the consent of defendant, then put a shell in the gun, shot it off, and kept the shell; that defendant furnished him this shell; that it was a single barrel Stevens shotgun, number 12 gauge. (The above gun was produced at the trial). Witness further testified that after the shooting he passed defendant's house, saw no lights, and did not see anybody around there; that he went to Cleveland's house, and found the snapped yellow shell, five or six feet from the front door; that it was called a Nu-Black shell; that it was a number 12 shell and was loaded; that he did not remember trying this snapped yellow shell in defendant's gun; that the shell and the gun of defendant were both No. 12; that he got a blue shell from defendant after the shooting, numbered 12; that the next morning after the shooting he saw some tracks in the garden, east of the house; that they appeared to be a man's tracks; that they came in to the east side of the house, and then around to the south side; that he traced these tracks across the block into the street; that one was coming and one was going; that they looked like the same tracks; that the tracks appeared to have been made by a number eight or nine shoe, something like that; that the tracks were kind of round at the toe; that he saw Cooper Anderson measure the tracks with a stick and he compared that with shoes found in defendant's house; that nobody else lived in defendant's house but himself. Over the objection of defendant, the witness was permitted to testify that the tracks which he examined looked like they were made by defendant's shoes.

On cross-examination witness testified that sometimes he wore a No. 8 and sometimes a No. 9 shoe. He declined to have his shoes measured, but admitted they were like those produced in court which he said were taken from defendant's house; that he could not swear said shoes belonged to defendant; that the tracks he measured were in soft mud; that the shoes produced in court were clean when found at defendant's house, and were still in that condition at the time of trial; that he didn't put the shoe in the track to see if it would fit; that he saw an automobile track near the bridge the next morning after the shooting; that it was thirty or forty feet south of the bridge; that he asked for a No. 12 shell, at defendant's house, and got a blue shell. He saw no other kind of shells there.

George Drummond lived at Bedford and carried the mail. He testified, that he had known defendant about seventeen years; that he had known Leo Ramsey about one year; that before the shooting, defendant asked witness if Leo Ramsey and George were there when witness took defendant's wife to the depot. He said, "I believe they are the trouble between me and my family." He was referring to the fact that Leo Ramsey and his wife were together at appellant's house when the wife went to the depot. The above was eight or ten days before the shooting. Witness told defendant that Leo Ramsey was at his house with appellant's wife; that on December 30th, defendant asked him if Leo Ramsey came to Bedford, cursed him, and witness answered, "No;" that defendant then said, "Well, there will be h—— popping when he does come in," after which he walked off; that defendant told him he believed the Ramseys and Clevelands were the cause of all his trouble; that he ought to take a gun and blow the "heads off the whole d——n son of a b—— outfit of them;" that defendant was not at home when his wife and Ramsey left.

On cross-examination witness testified that defendant's reputation for being a peaceable and quiet man was good.

294 Mo.—23

Mr. Oscar Norris testified that he lived at Bedford, farmed and ran the telephone office; that defendant was not at Cleveland's after the shooting; that the shooting occurred between 7:20 and 7:30 o'clock; that he saw Jamison pick up the yellow shell that night, loaded with No. 6 shot; that he never saw any light in defendant's house before the shooting; that he saw a light in defendant's house about 9:30, the night of the shooting, and it burned all night; that the next morning after the shooting he found a shoe-heel track, about two feet from the walk at Cleveland's house, and about four feet from the house, and this shell was close to said track; that he saw tracks going out east through the garden gate, coming and going; that the first tracks he could see were at the bridge; that this was about two blocks north of defendant's house.

On cross-examination witness said he did not trace the tracks as far as the east and west street; that he saw an automobile track up there near the bridge; the automobile track looked like it came from the north, and then backed and went north again; this automobile track was about six or eight feet from where he found the first track of a man; that he saw a car turn around at the above place about three or four o'clock in the evening; that the man who drove the car was a stranger; that he heard a car moving a few minutes after the shot; that the above car started from the lumber yard from five to ten minutes after the shooting, was running under full power and crossed the bridge.

Cooper Anderson testified that he heard the shooting after seven o'clock; that he saw Jamison pick up the yellow 12 gauge shell which had been snapped; that he examined the tracks, and measured the foot prints; that the shoe which he used for measurement, was a number seven or something like that; that he could not tell the number by the measurements; that the tracks were made by a shoe, similar to the one shown him; that the stick shown witness was the one used in making the measurements; that he compared the measurements

made on that stick with said shoes; that in measuring, the shoe would naturally pull back and he couldn't get the exact measurement; that the measurements on above stick tally with one of the shoes, but not with the other.

Don G. Jagger testified that three or four days before the shooting he sold Henry Singleton, and a little Mitchell boy, a box of shells; that Henry is the son of defendant, and the other boy was twelve or fourteen years old; that he sold Henry, Peters shot gun shells, number six; that the shell shown witness was like those sold Henry; that he sold them for money, and didn't trade for rabbits; that he did not remember which boy paid for the shells.

Ross Diehl, the Sheriff of Livingston County, testified that he arrested defendant on January 2, 1921; that he told defendant he had a warrant for his arrest, and appellant said he had been expecting it; that he measured the foot-prints around Cleveland's house the day he arrested defendant; that Anderson and Keeler were with him; that the tracks were made by a flat-heeled, broad-sole, round-toed shoe; that he saw defendant take his shoes off, and they tallied with the tracks; that he got two or three No. 12 shotgun shells from defendant, a blue shell; that he got the 12 gauge gun used in evidence from defendant.

Frank W. Ashby, prosecuting attorney of Livingston County, prior to December 31, 1920, testified that he had a conversation with defendant prior to the shooting, in which the latter talked about his wife's daughter, and told him that his wife and her daughter were threatening to take some household goods from his house, and he did not want them to take said property, because it belonged to him. He told witness he was afraid they would take the property while he was out in the field at work, and wanted to know what he could do, if they took the things in his absence.

S. Witherell, a gunsmith, examined the gun of defendant heretofore mentioned. He testified that there

was a small battered place on the lower side of the firing pin of said gun, caused by the pin having at some time struck the base of the plunger when there was no shell in the gun, and thereby flattening that part of the firing pin; that the firing pin is a little short, caused from use; that he had fired the gun two or three different times, within the last week before testifying; that the flattening of the firing pin shows a distinct marking on the lower part of the shell that is down, making it flat on the bottom, instead of round as a perfect undamaged firing pin would do; that the flattening of the firing pin does not necessarily make the gun snap at times; that that defect would not have anything to do with the gun firing; that the reason of the gun not firing every time, is on account of the firing pin being battered so that it doesn't go through the full length of the firing pin; that it is locked when it gets there, that is, battered at the head so it can't go any farther; that the firing pin of the above gun is in that condition, and snaps at times; that he marked the shell which he fired, and identified the same as they were offered in evidence; that there are a number of different makes of yellow shells; that the above shells, shot by him, are No. 12 gauge; that all the shells which he fired had the same marking; that out of the nine shells he fired, two failed to explode; that on the unexploded shells the marking is very light, because the plunger didn't go deep enough to leave an impression there; that would justify him in saying that shell was snapped in this gun; that it is possible it might have been snapped in that gun, but he was not justified in saying it was, because the marking is so indistinct.

On cross-examination witness testified: "I wouldn't say that that shell had ever been snapped in that gun."

The shells, gun and stick, over the objection of defendant, were offered in evidence, and this closed the State's case in chief.

Appellant interposed a demurrer to the foregoing evidence, which was overruled.

The court limited defendant to five character witnesses, and thereupon J. P. Alexander, B. B. Alexander, J. F. McDaniel, Mont Woody and Jim Brown, each testified that defendant's reputation for being a quiet, peaceable citizen in that community was good.

Henry Singleton, son of defendant, testified that he was fifteen years old; that before Christmas he bought a box of shells from Jaggers; that Ralph Mitchell was with him; that they killed rabbits with these shells and paid for them in that way that when the shot was fired, on the evening of December 31, 1920, he was standing in front of Cleo Van Laningham's store; that in about five minutes after the shot was fired, he went home and found his father, the defendant, in bed; that he then told his father about the shooting.

On cross-examination, he testified that after the shot was fired, he went to his grandfather's across the street, and his grandfather was getting in bed; that his grandfather then came on home with him; that he never heard defendant make any threats against Leo Ramsey's life; that his father had some trouble with Ramsey's wife.

Mr. E. A. Singleton, father of defendant, testified that shortly after the shooting on December 31, 1920, defendant's son came by and told him about it; that he went with the boy to defendant's house, about seven o'clock and found the defendant in bed; that no other person was there.

On cross-examination witness testified that he was in bed when Henry told him about the shooting; that he never heard the shot fired; that Henry Singleton ate supper that evening with witness, about six o'clock, and then came back; that the boy told his father, Ramsey was shot; that defendant said, it was too bad; that he said to defendant: "They will lay this on you;" that defendant said, "Oh, I guess not;" that he picked up the gun, before he left, which belonged to witness, and not to defendant; that he put his finger in the end of the barrel, to see if the gun had been shot and found

that it was clean; that he put his hand on the bed and found it was warm; that he never heard defendant say a word about Leo Ramsey until the next morning after the shooting; that he (defendant) then said to Ike Jamison, the constable, "I couldn't have shot that fellow, I had nothing against him, I never spoke to that man in my life;" that the gun had not been shot when he put his finger in it; that he had no idea of the shooting; that he knew defendant and his wife had been having some trouble, and that was why he hurried down to defendant's house.

Defendant, William Singleton, testified in his own behalf, that he was the defendant herein; that on December 31, 1920, he heard a shot fired in Bedford between seven and seven-thirty o'clock; that he was at home in bed when he heard this shot fired. Over the objection of defendant, he was compelled to testify as to what occurred before the shooting, although not examined on this subject, He testified that he was up in town a little after dark; that he was in all three of the stores, but went home and was in bed when the shot was fired. After the defendant had been compelled to answer the above inquiry, the court then sustained an objection as to its competency.

Defendant rested, and the State offered the following evidence in rebuttal.

Mr. Morris Dorney testified that he heard defendant's father say, he put his finger in the gun to see if it had been shot, that he was afraid Bill did it.

Ross Diehl, the sheriff, testified that he asked defendant where he was the evening of December 31, 1920, and defendant told him he went to the store, and stayed there until about dark; that he then went home, went to bed and never left the house that evening any more.

At the conclusion of all the testimony, defendant again interposed a demurrer thereto, which was overruled, and an exception duly saved to the overruling of same.

Defendant, in due time, filed motions for a new trial and in arrest of judgment. Both motions were overruled, defendant duly sentenced, etc. Appellant, in due time, appealed from the judgment against him to this court.

Such other matters as may be deemed important, will be considered in the opinion.

I. It is earnestly contended by appellant that there is no substantial evidence in the record upon which a conviction can be legally sustained.

All the testimony has been fully set out in the preceding statement, and will only be referred to in general terms. No witness claims to have seen appellant shoot Leo Ramsey. No one claims to have seen him with a gun or shells, on the day of the shooting. No one claimed to have seen defendant near the scene of the shooting on said day. On the other hand, there is positive evidence tending to show that defendant was at home in bed at the time of the shooting. There is no question about part of the *corpus delicti* having been shown, for it is undisputed that Leo Ramsey, on the evening of December 31, 1920, was unlawfully and feloniously shot, and badly wounded, by some one. The duty, however, devolved upon the State of showing, beyond a reasonable doubt, that defendant was the agency through whom said crime was committed. In cases of this character, the crime may be established by direct evidence, or by circumstantial evidence sufficient to sustain a conviction. The facts herein, present a typical case of circumstantial evidence, and the sufficiency of same, to sustain a conviction, will now be determined.

In considering the merits of this controversy, it is well to keep in mind some elementary principles of law which are applicable to the case in hand. The trial court properly told the jury by its instructions, that the law presumed the innocence, and not the guilt of defendant, and this presumption of innocence attended him throughout the trial. The defendant was not only clothed with the above pre-

*Circumstantial Evidence: Corpus Delicti.*

*Presumption of Innocence.*

sumption, but his general reputation for being a peaceable and quiet citizen was shown to be good. As said by this court in State v. Morney, 196 Mo. l. c. 49:

"When a conviction for felony rests altogether upon circumstantial evidence, as in this case, 'the circumstances proved must be consistent with each other, consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt.' [12 Cyc. 488, and authorities cited.]"

To same effect are State v. Ruckman, 253 Mo. 487, and State v. Lee, 272 Mo. l. c. 127-8.

Keeping in mind the above principles of law, by which we are to be governed in our disposition of the case, we will separately consider the contentions of the State in support of the verdict.

(a) It is insisted by respondent that a sufficient motive for the commission of the crime was shown. It may be conceded that defendant and his wife were living apart, and that defendant thought Leo Ramsey was largely responsible therefor; that Ramsey and his wife, who was the step-daughter of defendant, were threatening to take some of the property from appellant's premises which he claimed to own, and that both defendant and his father, in speaking of Ramsey and wife, gave them a very bad name, and asserted that they ought to be shot, etc. There is no evidence in the case tending to show that defendant said he intended to shoot either Ramsey or his wife. It does not appear from the evidence that defendant ever owned a gun or that he made any preparation towards shooting either Ramsey or his wife. The undisputed evidence is, that defendant's father owned the single-barrel 12 gauge gun, and that defendant's son bought the shells turned over to the sheriff. In other words, there is no evidence in the record tending to show that defendant owned a gun or that he ever used one at any time. It

*Motive.*

is probably true that he felt•aggrieved at Ramsey and wife, and that he used very profane language in discussing their conduct. We may concede, however, for the purposes of the case, that there was sufficient evidence, as above indicated, to establish a motive for the commission of the crime   Speaking on this subject, WILLIAMS, J., in State v. Ruckman, 253 Mo. l. c. 499, very clearly and forcefully stated the law of this State, as follows:

·''Evidence of motive is admissible, as furnishing one link in the chain of circumstances, tending to establish guilt, but mere showing of motive, uncorroborated by other facts and circumstances inconsistent with innocence, is not sufficient prima-facie showing to authorize the submission of defendant's guilt to the jury. It would be a rather unjust and dangerous rule that held that the mere showing of motive and opportunity would overcome the presumption of defendant's innocence and establish, beyond a reasonable doubt, his participation in the criminal act. Aside from the showing of a possible motive, there is no other fact or circumstance which, in any way, points towards defendant's guilt.''

(b)   It is claimed by the State that there was some evidence tending to show that the ground around Cleveland's house was muddy and soft; that tracks were made by some man wearing a shoe numbered 7, 8 or 9, and that the tracks might have been made by defendant's shoes.

Foot-prints.

No one stated when these tracks were made, and no one was seen making them. The evidence was conflicting as to whether the shoes fit the tracks. The shoes worn by defendant were in general use, and at that very time the constable, who was the main witness for the State, had on a pair of shoes similar to defendant's. The defendant voluntarily turned over to the officers of the State the gun, shells and shoes offered in evidence, in order that a full investigation of the facts might be made. It is undisputed that the above shoes were clean and contained no mud thereon, although the measured tracks

were in the mud. No shoes of defendant were produced containing any mud. No testimony was offered tending to show that the above shoes were cleaned between December 31st and January 2nd, when they were taken off by defendant and turned over to the sheriff. The testimony in relation to the tracks aforesaid having been made by defendant while wearing said shoes, has no probative force whatever, as evidence tending to show defendant's guilt, and is based purely upon the weakest kind of conjecture.

(c) It is contended that the unexploded, snapped, yellow shell, found a few feet from the Cleveland door, belonged to defendant, and was dropped by him at the time of the shooting.

No yellow shells were found by the State at the home of defendant. The latter voluntarily turned over to the sheriff some blue shells which were bought by his son, and no others were found in defendant's possession. The gunsmith, who examined the yellow shell, Gun Shells. supra, which had been snapped, said you could not say it had been snapped in the gun aforesaid, as the marks on said shell were too light and indistinct to indicate that fact. The testimony relating to the above shell, is likewise without probative force in establishing defendant's connection with the shooting. It is purely speculative in its character, and should have no weight in passing upon the merits of the case.

(d) It is suggested that the jury had the right to take into consideration the conduct of defendant in failing to go to the Cleveland home after the shooting. This suggestion is not worthy of serious consideration. Visiting Scene of Crime. In our opinion, if he had gone there, it would be contended with equal plausibility, that he had done so to avoid suspicion. Where the liberty of a man is at stake, this kind of speculative argument is without merit.

(f) It is finally contended that as some of the witnesses passed by defendant's house, shortly before, and

soon after the shooting, without seeing any light, or any
person around there, the jury had the right
to consider this, as a circumstance tending to
show defendant was elsewhere, and did the
shooting.

**Darkened Home.**

This testimony was of no practical value, unless
some witness had testified that he went to defendant's
house, with the view of ascertaining if he was there,
and found him absent. The uncontradicted testimony,
however, conclusively settles this question adversely to
the contention of the State. Mr. Balleu, witness for
respondent, testified that defendant was in his store and
left there about twenty or thirty minutes before the
shooting. Defendant said he was there, went home and
was in bed when the shooting occurred. Sheriff Diehl
testified that defendant, on January 2nd, when he was
arrested, told him that "he went down to the store and
stayed until along about dark, and went home and went
to bed, and never left the house that evening any more."
Defendant's father and son, each testified, that they
went to defendant's house within a few minutes after the
shooting and found him in bed. The father testified that
he put his hand on the bed, and found it warm; that he
put his finger in the gun, found it was clean and had not
been shot. It is not claimed that defendant had any gun
or shells when he was in Balleu's store, nor that he was
not wearing the same shoes offered in evidence.

In the face of the foregoing positive evidence, would
it be permissible for a jury to conjecture, without evi-
dence to support it, that defendant, after leaving Bal-
leu's, went home, got his gun and shells, changed his
shoes, traveled to Cleveland's house, did the shooting,
returned to his home, without any one seeing him, and
went to bed? With the presumption of innocence at-
tending defendant, sustained by a good reputation for
peace and quietude, we are of the opinion that the con-
tention of respondent, in respect to the above, is not sus-
tained by either the law or facts in the case.

Without prolonging this discussion further, we have reached the conclusion, without hesitation, that defendant was improperly convicted; that the record contains no substantial evidence as to his guilt, and that the verdict herein is based upon mere conjecture. The appellant's demurrer to the evidence at the conclusion of the whole case should have been sustained.

Conjecture.

[State v. Remley, 237 S. W. (Mo.) l. c. 491-2, and cases cited; State v. Keller, 229 S. W. (Mo.) 203-4; State v. Kelsay, 228 S. W. (Mo.) l. c. 756; State v. Welton, 225 S. W. (Mo.) 965; State v. Hollis, 284 Mo. 627, 225 S. W. 952; State v. Tracy, 225 S. W. (Mo.) 1009; State v. Adkins, 222 S. W. (Mo.) 431-2; State v. Lee, 272 Mo. l. c. 127-8, 182 S. W. 972; State v. Ruckman, 253 Mo. l. c. 500-1; State v. Francis, 199 Mo. 671; State v. Morney, 196 Mo. 49-50-1; State v. Scott, 177 Mo. 665; State v. Crabtree, 170 Mo. 642.]

As all the parties who probably knew anything about the facts in this case testified as witnesses, we see no good cause for remanding the case for another trial. The judgment below is accordingly reversed and defendant discharged. *White* and *Reeves, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All concur, except *David E. Blair, J.,* not sitting.