THE STATE v. FERD MANSKER, Appellant.—98 S. W. (2d) 666.

Division Two, November 17, 1936.

W. H. *Grissom* and *John Fletcher* for appellant.

*Roy McKittrick*, Attorney General, and *Wm. Orr Sawyers*, Assistant Attorney General, for respondent.

COOLEY, C.—In the Circuit Court of Mississippi County appellant was convicted of murder in the first degree and sentenced to life

imprisonment for the killing of Elisha (called Lige) P. McCutchan, in said county. We shall refer to appellant as the defendant and to McCutchan as the deceased. The killing occurred on the night of July 3, 1935. That it was murder is clear from the evidence and is not seriously disputed. Defendant's motion for new trial presents but few questions for review, mainly the giving of certain instructions on the subject of conspiracy, defendant contending that the evidence did not warrant instructions on that theory, and the admission of certain evidence relative to deceased's financial status and living conditions in his home.

The theory of the State was that deceased was murdered for the purpose of collecting his life insurance, pursuant to a conspiracy in which were implicated C. V. Williams, Bud Greece, Albert Vowels, Chester ("Big Son") Brightman and the defendant. Brightman is a negro, the other alleged conspirators being white men. The evidence tended to show the following:

Deceased was a man in very poor circumstances, working at common labor for small wages and living in a small three-room box house, which was in ill repair and poorly furnished. At times he and his family lacked sufficient food. In March, 1935, Williams, an insurance agent working for the Kansas City Life Insurance Company, wrote and delivered to deceased a policy of life insurance, insuring deceased in the sum of $2500, and another of like amount insuring deceased's wife. It is a fair inference from all the evidence that Williams, at the time of writing these policies, had in mind making away with deceased or his wife, or both of them, or procuring it to be done, for the purpose of himself collecting the insurance. Some time before deceased was murdered—the time does not definitely appear—Williams went to the McCutchan home and procured the policies. It seems that there had been some default in the payment of premiums, but from statements of Williams to witnesses in the case it appears that the policies could yet be kept alive by payments of the premiums, which Williams apparently made. Two or three days after deceased's death Bud Greece was arrested in Danville, Illinois, and had the policies in his possession, together with a paper which is not set out in the record but which the evidence indicates was a written assignment of the policies to Williams.

Vowels testified as a witness for defendant. He had been indicted for the same offense. Although warned by the court, in the presence of his attorney, that there was an indictment pending against him for the same offense and fully informed of his rights he testified voluntarily. He said, in answer to a question propounded to him on cross-examination, that he had already either been convicted or had pleaded guilty but, if so, it is not shown that he had been sentenced. At any rate, as stated, he was called by defendant and testified

freely, and at some length. Such further reference to his testimony as may be deemed necessary will be made in the course of the opinion. For the present we deem it sufficient to say that from facts testified to by him and from all the facts and circumstances shown in evidence it is clear that there existed a conspiracy to kill deceased among at least Williams, Greece, Vowels and Brightman, as early as June 10, 1935, and on the part of Williams a design to that effect and conversations between him and Vowels relative thereto for some time prior to said date.

The evidence tending to link defendant with the conspiracy is not so clear. He was an intimate friend of Vowels and at the time of the murder was working for Vowels at the latter's garage at Wyatt, Mississippi County. He knew the other alleged conspirators, but the evidence does not show that, prior to the murder, he had had any conferences with Williams or Greece. He had ample opportunity, of course, to confer with Vowels. Of such conferences and of the testimony of Brightman, a witness for the State, we shall speak later.

Deceased lived on what appears to have been a somewhat lonely dirt road several miles from Wyatt. The distance of the place of the homicide from deceased's home is not shown. His body was found there the next day. The homicide appears to have been committed between about eight or eight-thirty P. M., and midnight of July 3rd. Deceased was killed by being struck on the head with some heavy blunt instrument—the State's evidence tends to show a heavy hammer. The circumstances—as well as Brightman's testimony—tend to show that he was struck from behind, while urinating. His skull was crushed. The blow or blows must have caused practically instantaneous death. While the State, as we have said, contends that the killing was pursuant to the conspiracy we have referred to, its evidence—the testimony of its witness, Brightman—is also to the effect that the defendant himself struck the lethal blow, or at least one of them—there appear to have been several blows struck.

Brightman, a witness for the State, testified in substance as follows:

About two days before the murder Vowels came to him in the field where he was "chopping" cotton and told him he (Vowels) and "Mr. Ferd"—defendant—had a job with "a right smart of money in it," that Brightman could make more money doing that job. Vowels did not then tell him what the job was nor how much it would pay, promising to tell him later. The next day, July 2nd, Vowels again saw him in the field. He asked Vowels what the job was and Vowels told him he, Vowels, would give him $200 to "bump a man off" but did not tell him who the man was. Brightman says he told Vowels, "I ain't never done nothing like that in my life, I ain't never killed nobody, I wouldn't do that." Vowels then said to him, "Well,

just go with me and Mr. Ferd, then," to which he said "All right," in order to get Vowels out of the field so that his employer "wouldn't say nothing about holding the mules up." Vowels cautioned him not to tell anybody, to which he agreed, and Vowels left. Testimony of other witnesses corroborated Brightman's testimony that Vowels saw and talked with him in the field.

According to Brightman's testimony he next saw Vowels the evening of July 3rd. He says he had run out of gasoline and was on his way to get some when he met a boy in a car who took him to Vowels' garage at Wyatt, his purpose being to get some gasoline. There he met Vowels, who said he was just starting to see him to get his battery, which it seems Brightman had. He got a gallon of gasoline and started afoot to his home, not far from Wyatt. While putting the gasoline in his car Vowels came, in his own car. (Vowels testified that he went to get his battery which was needed to start the Delco lighting system at the garage.) Brightman said he then started to Wyatt but his car would not run and Vowels, with his car, pushed him to Wyatt. Vowels then, in his car, took Brightman's mother and some other relatives home, Brightman going also, riding on the fender. He got off the car but Vowels, when he had turned around, asked him to "come go a piece with me." He got in the car and then for the first time discovered that deceased was also in the car, "laying over on the left hand side in the corner, asleep." He asked Vowels "Who is that?" to which Vowels replied, "That's the man I was telling you about."

During the occurrences above referred to on the evening of July 3rd, defendant was at Vowels' garage. According to Brightman when he and Vowels returned after taking his mother home, Vowels and defendant "talked a little, I don't know what about, . . . turned around and come back to the car" and defendant told Brightman to get in the back seat which he did. It appears deceased was also in the back seat, and Vowels and defendant rode in the front seat, Vowels driving.

Brightman then described in detail the route they took toward deceased's home, stopping several places, once to get a lunch, two or three times to buy liquor and to take drinks. When they reached a place where the road "goes under the railroad" Vowels stopped the car, leaving the engine running, they all took another drink and "Mr. Albert (Vowels) and Mr. Ferd (defendant) gets out of the car and talked . . . I don't know what they talked about, they come and get back in the car and pulls on out to the next little road, crosses over the railroad and stopped again and we all took another shot of the liquor, all except Mr. McCutchan, he wouldn't take no more. . . . We go down at the side of this alfalfa and get to a little bridge. Mr. Ferd says, 'This road is too rough, this is far

enough to go.' '' Here, for a space, we quote Brightman's testimony. After stating that the place where they last stopped was about a quarter of a mile west of the ''alfalfa''—apparently a place called the alfalfa mill—he testified:

"When we gets to the bridge he (defendant) said, 'This road is too rough, this is far enough to go, let's turn round;' well, Mr. Albert whipped the car to the right, run down to a little ditch and turns round, he backs up a little towards the bridge; Mr. Ferd gets out on the right hand side; Mr. Ferd is the first man out, and Mr. Albert rouses Mr. McCutchan, says, 'Wake up, old top,' that's what he said to Lige McCutchan; he roused up; after he roused up he says, 'Get out, this is as far as we are going, the road is rough.' At that time Mr. Albert gets out on the left hand side, I goes on over Mr. Lige's feet on out, and Mr. Ferd is on the right hand side. Mr. Lige McCutchan didn't act like he was coming out and Mr. Ferd shook him again and said, 'Come on out?' and he kinda staggered to the right, towards some bushes on the right hand side and he was trying to take a leak and Mr. Ferd reached in and pulls down the seat and pulls out a grass sack about that long and walks around behind the car behind me, and he pulls this hammer out of this sack, a hammer with a little ball knob on it; me and Mr. Albert were taking a leak on the other side of the car; about that time I heard the bucket rattle—the man had a bucket—I heard it rattle; Mr. Ferd had knocked him down; at that time Mr. Albert walked up to me, reached in the seat of the car and pulled out a gun about that long (indicating) walked up to me and reached over and got the hammer out of Mr. Ferd's left hand and says, 'Hit that man, nigger;' I went and took it in my right hand and hit him one lick and he took the hammer; I got in front of the car and seen some blood on my hand; he says, 'God damn it, get from in front of that car;' Mr. Albert hit him three licks and walked back and turned the lights out; he goes down the road about fifteen minutes and after while he comes back and all of us gets in the car and started back towards Bird's mill, and he told me in going along the road, 'Listen, don't you say nothing to nobody about this,' if I did I would get arrested; he said if he didn't kill me he would have me killed; I told him I didn't have nothing to do with that; we drives back out to the highway and gets to the levee and he puts me out at the levee. . . .

"He said he might pick up somebody and 'I don't want them to see you;' he said, 'If they ask you your name, you tell them something else;' I told him all right; I gets out of the car and I walked and they drove up to the place and stopped; well, I gets a little piece by the place and I stopped to see if they was coming in the car; about an hour or so they comes on and catches me, says, 'Say, old nigger, do you want to ride;' I says, 'Yes, sir;' there was a truck

right along behind them with no top on it; I goes on and gets in the car—they pull up and I gets in the car. Mr. Albert asked me, 'Where did you come from;' I said, 'I come from Cairo;' this little white boy (in the truck) asked me what was my name; I told him Robert Morris; he said, 'Well, us go to Wyatt,' and we went up there and turned right back on this little road by Mr. DePriest's store where Mr. Keen stayed, and he let Mr. Keen drive the truck and this other fellow gets in the car with us and he backs out and turned around and headed the car out, and Mr. Albert and this little fellow that come down the road with us gets a pint of whiskey, half pints, and they come back and this little fellow handed me half a pint and they had half a pint; this little fellow says, 'Let's go to Charleston; no,' he says, 'Let's go to Cairo.' ''

Brightman then described the subsequent movements of the trio that night—they remained together a good part of the night—and told how he finally took defendant and Vowels to their respective homes, he driving, and went home himself. Those movements need not be detailed.

On cross-examination Brightman claimed that on the evening of July 3rd there was nothing said about killing McCutchan, so far as he heard or knew, either before starting on the trip from Wyatt toward McCutchan's home nor on the trip; that he did not know or anticipate that such crime or any crime was to be committed; that the only reason he struck deceased was because Vowels commanded and forced him to do so; that when he struck deceased the latter was prone and motionless on the ground, having been struck and knocked down by defendant and that he struck only a light blow which would not have knocked deceased down had he been standing up. He said he had never agreed to Vowels' proposition to kill deceased.

Defendant testified in substance, as did Vowels, that they were simply taking deceased home as a favor, as Vowels had done a number of times before, and that they let him out or put him out of the car in the road and that Brightman got out also and when they last saw deceased he and Brightman were walking away together, no harm of any kind having come to deceased up to that time. The description of the place where they said deceased and Brightman got out of the car corresponds fairly well with that given by Brightman of the place where he said the killing occurred and where the body was found next day. Vowels testified that the reason he stopped and put deceased out of the car was because he was getting sleepy— had difficulty keeping awake—and was afraid he might go to sleep and run off the road, and that before stopping he had asked defendant to drive and the latter declined, saying that he too was sleepy. Defendant, in his testimony, did not mention that request. According to his testimony and a written statement he made about

a week after the murder he was asleep and "roused up" when the car stopped and he heard Vowels say (apparently to deceased) "You'll have to get out here, this is as far as I'm going." Vowels testified that Brightman said, when he got out of the car, that he was going to a "nigger honkytonk" in the neighborhood. It was shown by other evidence that there was no such place in the neighborhood.

Both Vowels and defendant testified in effect that they did not expect to see Brightman again that night but, after having stopped at a refreshment place on their way back, overtook and picked him up. Both admitted having falsely testified at the coroner's inquest that they did not know the negro whom they thus picked up on their return journey. Defendant testified that he had a reason for giving such false testimony at the inquest but did not state the reason. Vowels gave as his reason that Brightman's brother had told him that if he talked, Brightman (Big Son) would kill him. He testified that on the morning after the killing Brightman had come to him and asked him "Where's Williams, I want to find him and get that money?" "I says, 'What have you done?' He says, 'I have killed that man.'"

Vowels testified that as early as April 1st, and several times between that date and June 10th, Williams had tried to get him to kill McCutchan or to get someone to do it, offering on two occasions to pay $750 and on another occasion $1000, so that he, Williams, could collect the insurance; that he, Vowels, had not agreed to the proposition, but that he and Bud Greece had "talked about bumping McCutchan off" and Bud had asked him if he "couldn't get someone" and had also asked him why he did not do it and make some money. While denying that he had ever agreed to Williams' proposition to kill or procure someone to kill McCutchan Vowels testified that, just through friendship—a friendly accommodation?—he had conveyed to Brightman the information that Williams would pay him, Brightman, $200 or $250 if he would kill McCutchan. Vowels testified that he himself had never expected to get any money if McCutchan was killed. He admitted, however, that he knew the killing "had been talked"—he did not say at this point by whom—for three months before it happened. In rebuttal the State proved statements made by Vowels before the trial tending to contradict his testimony that he had never expected to get any money out of the nefarious scheme, and also that, in talking to the sheriff about the killing, he had said, "I didn't see who hit him. I wasn't looking," and, "Then we got in the car and we came on out and went back to the Lake Inn." The remainder of his statement to the sheriff was not shown.

In his written statement made about a week after the murder de-

fendant said that "about six weeks ago," which would be about five weeks before the murder, Vowels had asked him if he wanted to make some easy money by "knocking" a man off but that he had told Vowels he did not want any money that way and would not do it. He testified substantially the same at the trial, except that he there said he really thought Vowels was joking and did not pay much attention to what he said. Vowels denied having ever mentioned anything of the kind to defendant.

In our opinion the evidence warranted submission of the case on the theory that there existed a conspiracy to kill McCutchan, that he was killed pursuant thereto and that defendant was a party to the conspiracy. As we have said, the evidence clearly tends to show such conspiracy as among Williams, Greece, Vowels and Brightman. The testimony of Vowels and Brightman tends so to show and there was other evidence to that effect. It is true both Brightman and Vowels denied that they had agreed to do or to procure or participate in the killing, as did defendant. The jurors were not obliged to believe those denials and doubtless did not believe them in view of the proved actions of the men and the circumstances shown. The jury may well have believed that each of those three was trying to exculpate himself by putting the blame of the killing on the others—Brightman by claiming that he acted unwillingly and under compulsion and the other two by making it appear that Brightman alone must have killed deceased after being left alone with him in the road. That deceased was killed by one or more or by all of said three men seems indubitably clear. That the motive was to enable Williams to collect deceased's insurance seems equally clear. No other possible motive and no other possible murderer is suggested. There is no evidence tending to suggest even a suspicion that deceased had enemies who could have sought his life. Considering his indigent circumstances, generally known in the community, it can scarcely be imagined that robbery was the motive. The insurance policies of deceased and his wife had been assigned and delivered to Williams and were found in Greece's possession when arrested after the murder. There is nothing in the testimony of either Brightman, Vowels or defendant to suggest that deceased was killed because of any sudden quarrel or for any reason other than a deliberate purpose to destroy his life in order that his insurance might be collected. Why should either of those three men have participated in such a crime unless pursuant to a prior understanding, actuated by cupidity? And that it was done pursuant to prior understanding is indicated by the testimony of Brightman—the conferences between Vowels and defendant before starting on the trip and again when Vowels stopped the car a short distance from where the killing occurred, left the engine running and he and defendant left the car and conferred

with each other, and the circumstances immediately attending the killing, as detailed by Brightman. And if defendant was innocent why his admittedly false testimony at the coroner's inquest that he did not know Brightman, whom he did know well, when he and Vowels picked him up on the road on their return journey?

Vowels, according to his own testimony, had had several conferences with Williams about killing McCutchan or getting some one to do it, had conferred with Greece on the same subject, and knew that such killing was being talked for several months before it happened. He had also talked with Brightman about it. Defendant said that Vowels had broached the subject to him some five weeks before the murder. True, as we have stated, Vowels, Brightman and defendant all testified that they, respectively, had declined to have part in the proposed murder. But the jury evidently did not believe those denials, doubtless considering that actions may speak louder—and more truly —than words. Other circumstances might be recapitulated but we think it unnecessary. We have outlined them in our statement of the facts. We hold that there was sufficient evidence of defendant's participation in the conspiracy to take that question to the jury.

The foregoing disposes, adversely to defendant, of his objection to the giving of Instruction No. 3. A further objection, however, is made to Instruction No. 5, which reads:

"The Court instructs the jury that if you believe from the evidence in the cause beyond a reasonable doubt that the defendant entered into an agreement with C. V. Williams, Albert Vowels, Bud Greece, Chester Brightman, or with one or more of them, to kill Elisha P. McCutchan and that said Elisha P. McCutchan was killed by the defendant or by him and anyone or more of the other persons herein named, or by anyone of such other persons in the furtherance of such agreement then you will find the defendant guilty and in passing upon the question as to whether the defendant *any* anyone or more of said other persons entered into a conspiracy to kill said Elisha P. McCutchan, you have a right to take into consideration all the facts and circumstances shown in evidence on the trial of this cause."

Said instruction is challenged in the motion for new trial, first on the ground that there was no evidence of any agreement (conspiracy) between defendant and either of the other alleged conspirators to kill McCutchan and, second, for the further reason "that it instructs the jury that the defendant might be convicted if deceased was killed by a party not connected with the conspiracy." What we have said disposes of the first ground of objection. As to the second we think it obvious that the instruction does not so direct. It requires the jury to find that defendant entered into an agreement with the other four named persons or with one or more of them to

kill McCutchan and that McCutchan was killed by defendant or by him and one or more of the other persons *therein named* or by anyone of "such other persons," in the furtherance of "such agreement." The instruction is not subject to the criticism leveled against it.

In the motion for new trial it is alleged that the court erred in admitting testimony of Tony Kuntz, Bertha McCutchan and Ruby McCutchan because said testimony "only appealed to sympathy, and tended to prejudice the jury against the defendant."

The testimony complained of tended to show that McCutchan lived in a small, meagerly furnished "box" house and was in very poor circumstances. There was testimony, not complained of in the motion for new trial, from other witnesses to the same effect and tending also to show that McCutchan's earnings were small. Most of the testimony of the three named witnesses of which complaint is made—all of it that was of any consequence—was given in response to questions that were not objected to until after they had been answered. We might sustain the court's action in overruling the objections on that ground. But we are also of the opinion that the evidence was competent under the circumstances of this case. It tended to show that McCutchan was not financially able to carry the insurance in question, which must have been known to Williams and probably to the other conspirators, and we think was competent to be considered by the jury along with other facts and circumstances in determining the question of conspiracy.

Error is assigned in that the court failed to instruct the jury on the weight to be given the testimony of an accomplice and the weight to be given circumstantial evidence. No such instructions were requested. Those were collateral matters upon which the court was not required by statute, Section 3681, Revised Statutes 1929 (Mo. Stat. Ann., p. 3227), to instruct unless so requested by the defendant. See State v. London (Mo.), 295 S. W. 547, as to testimony of an accomplice; State v. Singleton (Mo.), 77 S. W. (2d) 80, 85 (7), and cases cited, as to circumstantial evidence. Moreover, in this case the evidence of defendant's guilt of the crime charged was not entirely circumstantial. There was direct evidence that he personally participated in the murder. It is well settled that where the State's case does not depend wholly upon circumstantial evidence it is not reversible error for the court to fail to give an instruction on circumstantial evidence. [State v. Simon, 317 Mo. 336, 295 S. W. 1076, 1081 (8).] In State v. Arnett, 338 Mo. 907, 92 S. W. (2d) 897, 901 (7-8), we said: "If a case partially depends upon circumstantial evidence, it is proper, but not mandatory, to instruct thereon." This point is ruled against appellant.

The record proper, including the indictment, verdict and judgment, is sufficient. What we have said above disposes, ad-

versely to appellant, of all matters preserved for review by his motion for new trial except, possibly, the first assignment therein, that, "The conviction . . . is against the evidence, against the weight of the evidence and against the law under the evidence." As to the first part of that assignment, that the conviction was "against the evidence," we are inclined to think, but need not here decide, that it amounts, technically and legally, to a concession that there was evidence in support of the verdict but that it was insufficient—in other words substantially the same as the second ground of that assignment, viz., that the conviction (verdict) was against the weight of the evidence. The latter ground, that the conviction was against the weight of the evidence, was a question, first and primarily, for the jury, and then for the trial court in passing upon the motion for new trial. It is not a question for this court on appeal if we hold, as we do in this case, that there was substantial evidence to support the verdict. If defendant meant by that assignment that there was *no substantial evidence* to sustain the verdict—and, *ex gratia*, for the purpose of this case, we give him the benefit of such liberal interpretation of his assignment without meaning it as a precedent—it is answered against him by what we have said above. The last ground stated, that the conviction was "against the law under the evidence" is too general and vague, under our statute, Section 3735, Revised Statutes 1929 (Mo. Stat. Ann., p. 3275), to present anything for review.

From the foregoing it results that the judgment must be and it is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.