**STATE of Missouri, Respondent,**

v.

**Samuel Dean SHRIVER, Appellant.**

No. 44316.

Supreme Court of Missouri.

Division No. 1.

Feb. 14, 1955.

R. B. Kirwan, Kansas City, for appellant.

John M. Dalton, Atty. Gen., Paul McGhee, Asst. Atty. Gen., for respondent.

DALTON, Presiding Judge.

Defendant was convicted of murder in the second degree and sentenced to ten years' imprisonment in the state penitentiary. See Sections 559.020 and 559.030 RSMo 1949, V.A.M.S.

■ The information charged that defendant, on June 9, 1953, at the County of Jackson and State of Missouri "feloniously, wilfully, premeditatedly, on purpose and of his malice aforethought, did kill and murder * * *" Marie Cecelia Shriver, who was his wife, by striking and beating her with his fists and feet. By omitting the word "deliberately" the information properly charged murder in the second degree. Section 559.020, supra; State v. Felder, Mo.Sup., 242 S.W.2d 535, 536; State v. Frazier, 339 Mo. 966, 98 S.W.2d 707, 711. While defendant has filed a full transcript on appeal, Supreme Court Rule 28.08, 42 V.A.M.S., he has not favored us with a brief. We must, therefore, look to defendant's motion for a new trial for the errors complained of. Supreme Court Rule 28.02. And see Section 547.270 RSMo 1949, V.A.M.S.; State v. Tillett, Mo.Sup., 233 S.W.2d 690, 691; State v. Ready, Mo.Sup., 251 S.W.2d 680, 681. Our examination of errors assigned in the motion for a new trial, however, is limited to those assignments which meet the requirements of Supreme Court Rule 27.20. And see Section 547.030 RSMo 1949, V.A.M.S., which was superseded by Supreme Court Rule 27.20 on January 1, 1953.

■ It is first contended that the state failed to produce substantial evidence to sustain the verdict and establish defendant's participation in the alleged crime. In determining the sufficiency of the evidence to support the verdict of "guilty of murder in the second degree as charged in the information," we must consider the evidence favorable to the state, together with such favorable inferences as may be reasonably drawn therefrom. Evidence to the contrary must be rejected. State v. Harmon, Mo.Sup., 243 S.W.2d 326, 331; State v. Ready, supra, 251 S.W.2d 680, 682.

The evidence favorable to the state tended to show that defendant and his wife, Marie, hereinafter referred to as the deceased, resided in a one room basement apartment in a residential building located at 3334 Harrison street in Kansas City, Missouri. The room contained a stove, a dresser, a bed, a cedar chest, a table and several chairs. About 3:30 a. m., on June 9, 1953, police officers were called and found the deceased in her night clothes,

lying on the bed in this apartment. She had been dead for several hours, her body was cold and "a bit stiff." Both of her eyes were swollen shut and there were bruises over her entire body as though she had been beaten. The bruises about her head, face, arms, chest and stomach were severe and there was a trickle of blood from her eyes and from her mouth. Her clothes were disorderly and at least one-third of her body was black and blue.

Defendant came into the apartment while the officers were there and said that the deceased was his wife and that he had awakened in the night and found that her body was cold. He got up and called an ambulance and then went over to his daughter's house and had just returned. Defendant had been drinking and his hands and knuckles were skinned up. Defendant further told the officers that he and the deceased and a Mr. Zumwalt, who had been working for him and who had been sleeping on a cot in the basement of the house, had gone to the residence of defendant's former first wife to take her some money, but she was not at home, and while he was looking for her, the deceased and Zumwalt had left defendant and returned home and he had had to get a taxicab to return. He said that when he stepped into the apartment, deceased was on the floor just inside the door; and that he had picked her up and put her on the bed and had then gone to bed himself.

In a written statement taken after his arrest, the defendant said that, when he returned from work at 5:30 p. m., on June 8th he found his wife in an intoxicated condition; that she had continued drinking until about 8 o'clock when a trip was made to take some money to his former wife; that before leaving on this trip his wife had gotten very angry and had made some nasty remarks about his taking money to his children and he had slapped her back-handed and told her to shut up; that his wife and Zumwalt had accompanied him on the trip in Zumwalt's car and they had driven off and left him while he was trying to find his former wife; that, after he returned by taxi to his apartment, Zumwalt

came walking out of the apartment and he chased him away with a hammer; that he later located his wife in the "T.V. room" of his landlord's apartment upstairs and went in after her and told her to go downstairs where she belonged; that she was so drunk she could hardly walk so he slapped her to get her downstairs; that he had almost had to carry her and, when he did get her downstairs, she got very abusive and started getting rough so he hit her to quiet her down; that she fell over backwards, striking the back of her head on the corner of the cedar chest; that, when her daughter arrived with a boy friend, he asked them to help him put her on the bed, but her daughter said to just let her lie there; that he tried to pick her up and put her on the bed but, due to her limber condition, he dropped her twice before he could get her on the bed; that she woke up at 11:00 o'clock and blood was running out of the corner of her mouth and he wiped it off with kleenex; and that at 3:00 o'clock he had found her cold and apparently dead and he notified her daughter and called the police and an ambulance.

Rita Long, a daughter of the deceased, testified that she visited defendant's apartment on the evening of June 8, 1953, about 9:30 p. m., and saw the deceased on the floor of the apartment near the door and in front of the dresser. She did not look at her mother too closely, but saw that "her clothes were all pulled up." She assumed that her mother had been drinking and she told defendant, who was present, to take care of her and put her to bed. About 3:00 a. m. the following morning defendant notified her that he thought her mother was dead.

Joseph B. Long, defendant's landlord, who resided on the second floor of the residence building, testified that on the evening of June 8, 1953, between 9 and 10 p. m., he, his wife and others were sitting out on the porch and he "heard some noise out in front," he thought it was defendant's voice and he looked and saw defendant out there telling Zumwalt "to get on out of here or he would kill him." Defendant followed Zumwalt up the driveway and

then returned after Zumwalt drove away. Defendant asked if deceased was there and, on being advised that she was not, he went in the basement and then came back out and went around the house, then back and up on the porch and into the house where defendant located deceased in the front room of the second floor. The witness saw defendant take hold of deceased and shake her and tell her to get on down there where she belonged. "He just led her on through the house until they got to the head of the stairs, and when they got there she kind of throwed her hands up on the door casing and said, 'Dean, give me time.' He said, 'Get on down there,' and he slapped her."

Dr. Hugh H. Owens, County Coroner of Jackson County performed an autopsy upon the body of deceased and signed the certificate of death showing the cause of death as "shock and hemorrhage due to ruptured liver and lacrated mesentery" (the latter being the tissue that holds the large and small intestines to the posterior wall of the abdomen) and multiple contusions of the head and body. The autopsy findings showed that deceased was about forty years old, five feet two inches in height and weighed about 140 pounds. Other findings were as follows: a swollen and discolored face; both eyes swollen shut; a large area of ecchymosis (bruising) on the left hip, right tibia or shin bone, left shoulder, arms and almost over the entire abdomen from the breast bone down to the pelvis bone, a large amount of free fluid in the abdomen, a two inch rupture of the liver (like it was mashed or bruised), the mesentery lacerated in three places, a blood clot behind the peritoneum (which is the covering of the abdominal cavity), blood in the walls of the abdomen and in the abdominal cavity, a laceration of the skull behind the right ear but no fracture and a large amount of blood beneath the scalp. The discoloration of the body was not the result of rigor mortis. The liver ruptures had been due to a blow or trauma of some kind.

Defendant testified in his own behalf that, on June 8, 1953, he and deceased had argued about the payment of alimony to his former wife; and that he had taken her by the shoulders and set her down and told her to shut up. He also reviewed the facts, as hereinbefore stated, with reference to his trip with deceased and Zumwalt and as to his return by taxicab. He said that, when he returned, he entered the basement by a rear door; that there was a light in the basement, but none was in his apartment; that, when he slammed the outside door, Zumwalt came out of his apartment; that, as he did so, he (defendant) saw deceased in the apartment either sitting or leaning against the bed on the floor; that, when Zumwalt saw him, he started running and defendant asked what was going on and started after Zumwalt; that when Zumwalt reached the head of the stairs he turned and kicked defendant in the mouth and against the hot water heater in the basement; that defendant's lip was "busted," his hand "banged up" and he was sore and bruised; that defendant picked up a hammer and chased Zumwalt, until he escaped in a car; that defendant returned to his apartment, but deceased was not there; that he later found her upstairs in the T.V. room and he went in to get her; that she was hardly able to walk and argued with him and he shook her and told her to come on downstairs; that she did not walk by herself in going to the stairway, because "she wasn't able to"; that, when they reached the stairway, it was dark and there was no handrail; that he was behind her and she fell on the stairs and "rolled down" some nine steps to the first landing; that, after her fall, he asked her if she was hurt and if he should call a doctor and she said, "no," she didn't want a doctor; that he then took hold of her and helped her into the apartment; that there were still no lights burning in the apartment and, as he started to turn on the lights, deceased started giving him trouble again and he pushed her back, shoved her with the back of his hand; that when the lights came on, she was lying on the floor; that at that time her daughter came in and he asked her to help him, but the daughter said "She is drunk, let her lay there"; that he tried to

pick up deceased and put her on the bed; that she was "just like a dish rag" and because of her condition, he dropped her at least twice, but finally set her on the bed; that she said she was hurt and appeared to be in pain, but refused to let him call a doctor; that before he went to bed he noticed a little trickle of blood coming from the corner of her mouth and he took some kleenexes and a towel and cleaned her up; that, later, when he spoke to her she asked to be left alone; and that around 3:00 o'clock he found that she was dead and her jaws were set. Defendant further testified that about a month before this she was beaten up by somebody in his shop in the garage; and that he wasn't at home when it happened. He further testified that when deceased got drunk she was "what you would call a wild cat" and "would just as soon tear your clothes off you as look at you." Defendant said that, at the police station, he was asked what was the matter with his hand and he said he didn't know, but that his hand was swollen and his knuckles were not skinned. A witness, Bane, an employee of defendant, testified that on the morning of June 8th he observed that the left side of deceased's face looked like it had been skinned and bruised as if she had fallen down or something like that.

■ The cause was properly submitted to the jury. There was an abundance of evidence concerning the severe physical injuries causing deceased's death. The jury could infer and find that these injuries did not exist prior to defendant's return from his work on the afternoon of June 8, 1953, nor prior to deceased's trip with Zumwalt and her husband in the automobile, nor prior to her return home and defendant's efforts to remove her from the T.V. room. Defendant's own evidence shows that she was able to take the automobile trip and return to her apartment; and that, although he saw her in their apartment as Zumwalt was leaving, she was not there when he came back from chasing Zumwalt, and he then found her in the T.V. room on the second floor of the building. The jury could well believe and find from the evi-dence that the severe bodily injuries shown could not have been produced by any such fall down the steps, as testified to by defendant, nor by falling and striking her head on the cedar chest in the apartment, nor by being dropped by defendant when being placed on the bed, all as testified to by defendant. The jury could infer and find that defendant was extremely angry with his wife on the evening in question; and that a motive existed for killing her, or at least severely injuring her. Such inferences could be drawn from his own testimony concerning his arguments with her about the payment of alimony to his former wife, her conduct in leaving him and returning with Zumwalt to their apartment, his subsequent return and finding them together in the apartment, and his further encounter with Zumwalt and his return and search for deceased. His own testimony, and that of witness Long, tend to show that defendant did not hesitate to strike the deceased. The evidence was such that a jury could infer and find beyond a reasonable doubt that the injuries producing death were inflicted by the defendant. There was substantial evidence to support the verdict of the jury. State v. Smith, 329 Mo. 272, 44 S.W.2d 45, 47.

■ The second assignment of defendant's motion for a new trial is "that the defendant complains of the instructions 2, 3, 4, 5, 6, 7, and 8 given for and in behalf of the state." The assignment does not set forth in detail and with particularity any specific ground of complaint with reference to any of the mentioned instructions and it is insufficient to preserve or present any matter for review. Supreme Court Rule No. 27.20. And see Section 547.030, supra; State v. Gaddy, Mo.Sup., 261 S.W. 2d 65, 67; State v. Bledsoe, Mo.Sup., 254 S.W.2d 618, 621.

Defendant next complains of instruction 2 to the effect that it is a comment on the evidence in reciting facts "not brought out in the trial" of the cause. Defendant says there was no evidence that the defendant kicked the deceased, or intentionally injured her and that there was no evidence

of such an intent or motive. Defendant says the testimony showed that defendant struck the deceased with his fists and she fell and that in picking her up, he dropped her several times; and that "this testimony tends to substantiate the defendant's theory that the state (sic) should have submitted an instruction on manslaughter, namely whether or not the defendant in dropping the deceased was guilty of culpable negligence."

Instruction No. 2 was the state's principal instruction submitting murder in the second degree. It contained a definition of the several terms used and submitted a finding, including this, that defendant "* * * wilfully, feloniously, premeditatedly and of his malice aforethought, and not accidentally as more fully explained in other instructions given herein, did make an assault in and upon one Marie Cecelia Schriver with his fists and feet, and did strike and beat the said Marie Cecelia Schriver, then and there and thereby inflicting upon her, the said Marie Cecelia Schriver, a mortal wound * * *."

■■ We do not construe the instruction as a comment on the evidence but as a submission of the necessary facts to a finding of murder in the second degree. See State v. Bayless, 362 Mo. 109, 240 S.W.2d 114, 121. While there is no direct evidence that defendant kicked the deceased, the jury could well draw that inference from the facts shown. It was not a comment on the evidence. Further, we find no evidence in the record to authorize an instruction on manslaughter by culpable negligence. The latter term has been defined as "negligence of such reckless or wanton character as to indicate an utter indifference to the life of another." See State v. Whipkey, 361 Mo. 1008, 238 S.W.2d 374, 376, and cases there cited. No such inference can be drawn from defendant's testimony concerning his own efforts to prevent deceased's interference while he was trying to turn on the light in their apartment, nor from his testimony as to his efforts to place deceased on the bed

after she was on the floor. Either defendant was guilty of the offense charged in the information and submitted by the instruction or he was innocent.

■ Defendant further contends that Instruction No. 3 is erroneous in submitting whether deceased came to her death by accident. He says that "* * * accident is a condition or state that requires amplification or explanation and, in submitting this abbreviated explanation that if the deceased came to her death by accident then you are to acquit the defendant without further explanation and in the absence of such explanation of just what accident meant, the State was in error." The instruction stated that if deceased came to her death by accident, the defendant should be acquitted; and, that it was incumbent upon the state to prove beyond a reasonable doubt the deceased did not come to her death by accident. The word "accident" is not a technical word, but is one in common use and generally understood by every one. If further explanation of the meaning of the term was considered to be necessary, defendant should have asked for clarification. State v. Gaskins, Mo.Sup., 89 S.W.2d 647, 650(8); State v. Loston, Mo. Sup., 234 S.W.2d 535, 538(8).

■ It is next contended that "In instruction No. 5 the jury were given a blanket commission to draw their inferences from all facts and circumstances surrounding the act; in other words, there was no limit on what testimony the jury could consider or just what testimony they should consider but they were allowed to derive their own conclusions and deductions from inferences that they had on certain facts and circumstances in the case." There is no merit in this assignment. Instruction No. 5 properly told the jury that "the intent with which an act is done may be proved by direct and positive evidence, or it may be inferred from all the facts and circumstances surrounding and attending the act and must be determined by the jury from the evidence given in the case." State v. Santino, Mo.Sup., 186 S.W. 976, 978.

It is finally contended that instruction No. 6 was a comment upon the defendant himself; that it specifically called the attention of the jury to the relationship or feeling for or against the defendant and the probability or improbability of the witness' statements and the interest of the witness in the result of the trial; that it was quite apparent the defendant was the most interested party in the cause: that the jury were told that they could consider all these matters in making up their verdict; and the inference was that the defendant was "the one they should study and consider to ascertain whether or not he was telling the truth as he was the one who was most vitally interested in the result of the trial."

The instruction is not subject to the criticism leveled against it. It began with the statement that "the jury are the sole judges of the credibility of the witnesses and the weight and value to be given to their testimony," then followed the usual form and closed with the statement, "All these matters being taken into account, with all other facts and circumstances given in evidence, it is your province to give each witness such credit and the testimony of each witness such value and weight as you deem proper." The instruction gave no more emphasis to the testimony of defendant than it did to the testimony of any other witness. It was not a comment on defendant. See State v. Burns, 351 Mo. 163, 172 S.W.2d 259, 268; State v. Summers, Mo.App., 281 S.W. 123, 125(7); Section 546.260 RSMo 1949, V.A.M.S.

As stated, the information was sufficient in form and substance. The verdict was responsive to the issues presented, the punishment assessed was within the limits prescribed by statute. State v. Reagan, Mo.Sup., 108 S.W.2d 391, 395; Section 559.030, supra. Allocution was afforded and judgment and sentence duly rendered and pronounced.

The judgment is affirmed.

All concur.