STATE of Missouri, Respondent,

v.

Arthur T. CLARK, Appellant.

No. 44308.

Supreme Court of Missouri.

Division No. 2.

March 14, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied April 11, 1955.

A. H. Blunk, Forsyth, Rogers & Rogers, G. W. Rogers, Clyde Rogers, Gainesville, Lincoln, Lincoln, Haseltine, Forehand & Springer, Harold T. Lincoln, Horace S. Haseltine, Springfield, for appellant.

John M. Dalton, Atty. Gen., W. Don Kennedy, Asst. Atty. Gen., for respondent.

BOHLING, Commissioner.

Arthur T. Clark appeals from a judgment imposing a sentence of life imprisonment for the first degree murder of Charles W. Cobb. The first trial resulted in a mistrial, a juror becoming sick. The second trial resulted in a life sentence, but the cause was remanded, 259 S.W.2d 813. The in-

stant trial was in December, 1953. Appellant claims error in submitting the State's case, in giving and refusing instructions, in admitting and excluding testimony, and that a juror was ineligible.

The State relies on circumstantial evidence. The facts are varied and detailed in this extensive record. We shall endeavor to hold the statement within reasonable bounds.

■ To establish an accused's guilt under circumstantial evidence, the facts and circumstances relied upon by the State must be consistent with each other and with the hypothesis of the accused's guilt, and inconsistent with his innocence and every other reasonable hypothesis except that of guilt. State v. Jones, 363 Mo. 998, 255 S.W.2d 801, 804, and cases cited.

■ The substantial testimony and every reasonable inference therefrom favorable to the verdict of the jury is taken as true and where the evidence thus supports the verdict of the jury, it is sufficient. Appellate courts do not weigh the evidence. State v. Jones, supra; State v. Harris, 324 Mo. 223, 22 S.W.2d 802, 806; State v. Shriver, Mo., 275 S.W.2d 304.

The theory of the State was that Ruby Cobb and Carl Wood had an "affair" and she was dissatisfied with her husband, and that appellant and his wife bore ill will toward Cobb because of his testimony that John May was incompetent at said May's sanity hearing. Ruby Cobb, Orma Clark, appellant and Clarence Wood were charged with the murder. The charge against Wood was later dismissed for want of evidence.

Charles W. Cobb (referred to by the witnesses as Charlie Cobb), a "frail" man of 65, was killed Tuesday, February 20, 1951, in the John M. B. May barn in Taney county, Missouri. His skull had been "practically pulverized" on the left side and there were nine stab-like wounds over the forehead, eye and nose, very probably inflicted with a heavy club that had nails in it. His billfold with $55 in it had not been disturbed. When found, a bucket with some feed in it was over his right arm. The weather had been stormy. Water was over the highway at places. School had been suspended and the telephone service was impaired.

Appellant with his wife, Orma, and their four children, of the ages indicated, Argel, 16 (who was away from home), Freda, 13, Louis, 9, and Arthur, 7, lived on the Forsyth-Cedar Creek road about 1.9 miles from the May barn and about 2½ miles north of Cedar Creek. Appellant's tool shop was west of his house, across the road, and a short distance south was the Bald Knob school. One traveling from appellant's to the May barn would proceed northwestwardly over the Forsyth-Cedar Creek road about .9 mile to the Dawson Merideth store and thence westwardly a mile over a "private" road.

Charlie Cobb, with his wife, Ruby, their four little boys, the oldest being about 8 or 10, lived 312 to 314 paces west of the May barn. The entrance of the barn was plainly visible from the Cobb house.

A short distance west of the Forsyth-Cedar Creek road, a road extended southwardly from the "private" road. Ed Persinger lived a short distance south on this road; and south of Persinger's residence is what is known in the record as Snap Creek hollow.

In the latter part of 1950 Clarence Wood and May batched on the May farm, and Carl Wood, Clarence's brother, roomed at the Cobbs'. Appellant had a contract for work on the Bald Knob schoolhouse. Clarence Wood was helping appellant, and in November, 1950, he and May moved to appellant's home.

One day, after a visit to his daughter's, May returned to the Clark home out of humor and wanted Clarence Wood to get his son to buy the May farm. Wood said "no." After that Orma Clark and May "talked up" a deal. Orma and Clarence went to Forsyth and saw Eric Wolf, a notary and abstractor, about checking the description and writing the deed. On December 5, 1950, appellant took his wife, John

May and Clarence Wood to Forsyth in his panel truck. In the meantime Carl Wood had moved to a room in Mr. and Mrs. Walter Zugg's hotel at Forsyth. Clarence sought to use Carl's room for the May-Clark transaction. Mrs. Zugg would not permit this, but allowed them to use the hotel lobby. The parties assembled in the lobby in the afternoon. Clarence brought Eric Wolf and General Rogers, who was attending court in Forsyth, to the lobby. Appellant and his wife brought May. Mr. Rogers examined the deed and, after calling attention to a $2,000 deed of trust against the land, made the deed subject thereto. John M. B. May thereupon executed and acknowledged a warranty deed conveying the land to Orma Clark. Clarence paid the notary from money given him by Orma. Appellant paid attorney Rogers.

The execution and delivery of the deed was followed by proceedings to declare May, who was about 75 years of age, incompetent. Appellant, his wife, and Clarence Wood went to Cobb's home several times and apparently had an understanding with Cobb that May was competent to transact business. Appellant took his wife and daughter, Freda, Mr. and Mrs. Cobb, Bill Cobb and Clarence Wood to Forsyth for the May sanity hearing on December 26, 1950. J. R. Gideon was appointed to represent the alleged incompetent. Appellant and his wife informed him that the Cobbs would testify May was competent. Charlie Cobb testified that May was like a child and not competent to transact business. Mr. May was adjudged incompetent. Appellant and his wife came up to Mr. Gideon after the hearing and he informed them the Cobbs (we understand, Charlie and Bill) had not testified as they had stated. Appellant answered: "Well, they sure didn't." Freda Clark testified that while her mother and Ruby Cobb were in the restroom, her mother told Ruby it was pretty dirty for Charlie to testify against them when they had taken him there to testify for them, and that her mother repeated the statement later in the truck. John May, who has since died, did not return to the Clark residence after the hearing. (The deed was set aside in an action subsequent to the death of Cobb.)

In January, 1951, appellant and wife discussed at their home the killing of Cobb in the presence of their daughter Freda, and Clarence Wood, (then about 68). Wood and Freda testified the killing was referred to as "getting the job done" or "doing away with him." During this time appellant and wife made trips to the Cobb home and Ruby Cobb made trips to the Clark home.

Clarence Wood testified that appellant stated Charlie Cobb "ought to be tooken with a club and knocked in the head and throwed over the bluff"; that Ruby Cobb ought to leave her husband "or get shut of him some way"; and that "he'd give $25 for the scalp of a Cobb." Wood told appellant the buzzards would give him away before he got out of sight. On another occasion appellant, his wife and daughter were around the stove when Wood walked up and Orma handed him a letter, which was said to be from Ruby Cobb. Wood testified the letter stated: "'If you don't get that job done in three days, I'll do it myself,' and he [Cobb] milked at the barn between 4 and 5 o'clock, and, I'd give a mortgage on two cows for $600.'" Appellant said "that the barn would be a good place to get it done." At that time Wood's understanding was that neither appellant nor he would have anything to do with it. Wood told them he would have nothing to do with it; that $600 would not pay the lawyer. Appellant said "he'd do it by himself and no one'd know nothin' about it." Other plans discussed for killing Cobb included pumping air into his veins and having a man from Kansas City do the job.

Vernon David, Ruby Cobb's 17 year old brother, lived with the Cobbs after sometime in December, 1950. A few days before the homicide Ruby had him take a note in an unsealed envelope to Orma Clark, telling him not to let anybody else see it. He did not read it. Orma Clark read it and said tell Ruby "'the job will be done'"; Ruby "'will know what I mean.'"

Other written communications were mentioned by Wood. Freda Clark testified she read a note to her mother from Ruby Cobb stating Ruby would give her mother her two best cows if she could not produce the money within three days after "the job was done."

At the time Orville Merideth, a bachelor, was charged with having raped Ruby Cobb. Wood testified that appellant asked him to get a letter addressed to a Merideth from the Merideth store, saying he would leave it at the barn and that would throw the blame on Orville Merideth.

One evening after work a few days before the homicide Orma Clark met Wood at the road and wanted him to "do that job." He told her, no; and asked why she wanted him "to do some crime like that," and: "She said she was afraid of her husband." She also said appellant "would do the job if I'd go with him. I told him, no; I told her, no."

Clarence Wood testified he went to the Clark home Monday morning before the homicide and Orma Clark told him Ruby Cobb had been there that morning and wanted to get that job done, to hurry it up. He left for Forsyth soon after lunch.

Clarence Wood testified that on Friday after the homicide he went to appellant's home and told appellant that he had passed a truck hauling the Cobb cows; that appellant said, yes; that appellant showed him a piece of paper on which was "a kind of a map" of the barn and surroundings and that appellant said: " 'There's where the man went in that did the murder and went away,' " indicating a man out of Kansas City did the job, and also said the cows would be sold and the man paid off.

Freda Clark corroborated witness Wood's testimony about conversations in which appellant, his wife, and Wood participated in her presence, including discussions of different methods of doing away with Cobb, the $600, the two best cows of the Cobbs, and Wood not wanting to have anything to do with it.

Freda Clark also testified that on February 20, 1951, her mother was confined to her bed with the measles; that appellant and she sowed grass seed in the morning although it was "plenty wet"; that she did not recall his being nervous or excited that morning; that appellant said to his wife that "it was rainy and it'd be a good day to get the job done, that the tracks would be covered"; that appellant put on a blue pair of overalls, which were torn, and a striped jacket over his other clothes and a pair of mismated rubber boots; that he told witness, if the little boys asked where he was, to tell them he was in the basement; that he left the house, she thought, between 2 and 2:30, and went across the road in the general direction of the May farm. She next saw appellant around 5 or 5:30 returning from the same direction; that when he came in "he said he'd got the job done and everything was O.K.," and that he was going to burn the boots. Appellant went into the middle bedroom, took his boots off, came out wearing a pair of shoes, was home a few minutes and left for Cedar Creek, saying "he was going there to give himself an alibi."

Vernon David corroborated other witnesses on the Clarks and Ruby Cobb making trips back and forth. He testified Ruby told him the Clarks were going to get rid of Charlie Cobb. He tried to have her not do it, to get a divorce. She told him she knew what she was doing and he would be sorry if he told; they would lay it on Orville Merideth. He was afraid. Witness was sick in bed with the measles the day Cobb was killed. Ruby Cobb went to Cedar Creek that morning for some groceries. She told him she had stopped and talked to the Clarks. Charlie Cobb worked out doors during the day. He came in and sat down in the front room with Ruby about 3:30 and about 4 p. m. he went out to milk. After he left, Ruby commenced looking out of the window toward the barn. She walked the floor and wrung her hands. Witness asked: "If he was comin' back." Ruby answered: " 'No, he ain't comin' back.' " About 5 p. m. Ruby sent the two larger boys to the barn.

They came back "and said their dad was dead."

There was testimony that one could walk (taking 31 minutes on a good day) from appellant's to the May farm and keep out of sight by going through the woods. Lonnie Davis was 14 in 1951. His mother was a cousin of appellant. He saw appellant almost daily. He lived south of and Ed Persinger, his grandfather, lived north of Snap Creek hollow, 1½ to 2½ miles from his home. He left home about 11 a. m. to stay at his grandfather's on the night of February 20, 1951. He thought he took about 30 minutes to arrive at Snap Creek. He started playing around at the creek and thought he played an hour or more. He had to go up the creek 200 or 300 yards to cross. After he crossed the creek he stopped to take care of a blister on his heel. While doing this a man passed through the woods about 50 yards from him going in the direction of the May barn. In his best judgment the man was appellant. Witness had been in no hurry and he did not know the exact time he saw the man, but it was in the afternoon. His grandparents had had their noon meal when he arrived.

Lyman Cardwell operated one of two stores at Cedar Creek. On February 20, 1951, he saw appellant about 12 or 12:30 at appellant's home working. About 5:15 p. m. appellant passed his store, went to the other store for a few minutes, and then passed again, going home. Appellant waved at him and had on a white or light colored shirt. Soon thereafter he was told "Uncle Charlie" was dead, and he arrived at the Cobb place in 10 or 15 minutes. He examined Cobb's body. The blood for some distance from the body was warm, fresh, and blood was still oozing from the wounds.

Albert Collins' home was the first house east of the May farm. Shortly after 5 p. m. on February 20, 1951, Ruby Cobb drove up and informed Dewey Collins, a deputy sheriff and Albert's son, her husband had been killed. He notified several persons and they went to the scene. He and his father testified that the next morning appellant passed, driving west, and in a few minutes came back and stopped. Appellant asked Albert twice if Cobb was "sure enough dead" and was informed Cobb had been beaten to death. Dewey was eating breakfast. Appellant insisted on seeing Dewey and wanted Dewey, who refused, to go into another room. Appellant asked Dewey if Cobb was "sure enough" dead and was again told he was. Appellant said his wife was very sick with the measles and he had not slept all night; that he had the radio on low and had heard a little of it; that he did not like it that he was not told about it, and wanted to know who had gone to the scene and who was there the following morning. They had known appellant for years. Appellant was "awful nervous," "trembling" and tears were "runnin' down his face," and he "hollered out awful loud," "spoke out loud that Charlie Cobb was a good friend of his"; that he guessed he had no business down there and had better not go down there. Neither had ever seen appellant in that condition before.

G. L. Hunt, sheriff of Taney county, investigated the homicide, going to the scene several times. Many persons had been there and he could find no worthwhile tracks. The murder weapon was never located. He testified, among other facts, that he was at appellant's a number of times after Cobb's death; that on his first trip appellant stated that Cobb and he were good friends; that he knew who did it but had no proof; that he, appellant, had an alibi for that day, and that Orville Merideth did it. Ruby Cobb on the night of the homicide informed witness the only person she thought would do anything like that to Charlie was Orville Merideth. On the fourth or fifth day after the homicide appellant gave witness a photostat of a letter and said Ruby Cobb sent the letter to his house to mail; that he opened it, read it, and then took it to Springfield, had a photostat made, brought the letter back, sealed the letter and mailed it to Carl Wood, to whom it was addressed. The photostat consists of seven pages of handwriting and is dated January 5, 1951. It, briefly, was to the effect that Ruby was deeply in love with the addressee (Carl Wood was over

70 when he died August 29, 1953) and asked him to help kill her husband. Witness stated on cross-examination that he never talked to Carl Wood about the letter because in his investigation he found out that it was impossible for Carl Wood to have killed Cobb.

Another writing in the hand of Ruby Cobb, offered in evidence by appellant, was addressed to Orma Clark. It was to the effect that if Orma would "do that before Wed. night I will get you $550 before Fri. night. You can get CBW [Clarence Wood] to help you."

Other testimony on behalf of the State need not be set forth. It, among other things, tended to corroborate witnesses Freda Clark, Clarence Wood, Vernon David and Lonnie Davis.

Appellant's testimony, briefly, was that he was at home and did not commit the offense. He was 44 years old at the time involved. Without going into detail, he denied the occurrences and statements attributed to him by State's witnesses Clarence Wood and Freda Clark. He did not recall making the statement "that this would be a good day to get the job done," but if he made the statement he had reference to cutting down some steel windows so they would fit in the schoolhouse, and that on the afternoon of February 20, 1951, he cut the windows with an acetylene cutting torch in the basement of his house until about 4 p. m. After fixing a wheel and tire on his truck, he went into the house for a short time and then to Cedar Creek to get groceries. He returned home soon after 5 p. m. Other testimony on behalf of appellant tended to establish his alibi, particularly his presence at the Cedar Creek store, and to impeach Freda Clark and Clarence Wood on statements made by them.

In connection with appellant's contention that the State failed to make a submissible case, we dispose of his points that error was committed in the admission in evidence of statements made by Ruby Cobb and Orma Clark out of the presence of appellant and in instructing on the existence of a conspiracy to kill deceased on the ground there was insufficient evidence that appellant ever entered into a conspiracy with them or any of them to kill deceased.

Appellant states in his brief that Ruby Cobb, Orma Clark, Carl Wood and Clarence Wood "plotted this murder and conspired to place the blame on defendant." The evidence established that Ruby Cobb and Orma Clark participated in the conspiracy. The State's evidence, if believed, also established that appellant participated in discussions of different methods of killing deceased, planning the method in which the homicide occurred, in plans and their execution for casting the blame on others, and sought to establish an alibi for himself. Usually a conspiracy is established by circumstantial evidence. Here we have direct evidence of appellant's participation in the conspiracy. This sufficiently distinguishes the instant case from State v. Buckley, 309 Mo. 38, 274 S.W. 74, 76, stressed by appellant, and cases like State v. Loeb, Mo., 190 S.W. 299, 304, broad statements therein standing overruled in State v. Stogsdill, 324 Mo. 105, 23 S.W.2d 22, 28.

■ The commission of the offense often marks the end of a conspiracy therefor, but the conspiracy may continue in the furtherance of the common design for various purposes after the crime. One of the purposes of the instant conspiracy was avoiding exposure and the placing of the blame on others, particularly Orville Merideth. Ruby Cobb's statement to the sheriff on the night of the homicide that she suspected Orville Merideth was admissible in evidence. State v. Strait, Mo., 279 S.W. 109, 114 [13]; State v. Hill, 352 Mo. 895, 179 S.W.2d 712, 716, quoting State v. Priesmeyer, 327 Mo. 335, 37 S.W.2d 425, 427. A short time thereafter appellant told said sheriff that Orville Merideth did it.

■ There was sufficient evidence to warrant a submission and finding that deceased was killed pursuant to a conspiracy and that appellant was a party thereto. State v. Clark, Mo., 259 S.W.2d 813, 816 [3]; State v. Richetti, 342 Mo. 1015,

1038, 119 S.W.2d 330, 342; State v. Mansker, 339 Mo. 913, 98 S.W.2d 666, 670.

■ True, as pointed out by appellant, Ruby Cobb testified at the second trial but did not testify at the instant trial. The State made a stronger case with her testimony than without it. Appellant in his argument attacks the credibility of Clarence Wood—claiming the State's attorneys repudiated this witness in their argument to the jury, Vernon David—saying he admitted he had given his information in different ways, and questions the truthfulness of Freda Clark's testimony. We have painstakingly studied this record. We do not read it as appellant argues. The arguments of the State's attorneys with regard to witness Wood were to the effect they were not approving his actions but that his testimony was for the jury to weigh in the light of the facts and circumstances established by other evidence. Appellant does not point out in his brief in what circumstances Vernon David gave different statements of the facts. His testimony of record on the material issues appears to be consistent. We reach a like conclusion with respect to the testimony of witnesses Clarence Wood and Freda Clark. What appellant urges would affect the credibility of the witnesses. State v. Stogsdill, 324 Mo. 105, 23 S.W.2d 22, 27 [8, 9]. Their credibility and the weight of their testimony were for the triers of the facts. The testimony of each is corroborated in given particulars by the testimony of the other two and by other facts and circumstances adduced in evidence. The case is not like appellant's case of State v. King, 174 Mo. 647, 660, 74 S.W. 627, 631.

■ The evidence of appellant's guilt is stronger than was the evidence in State v. Singleton, 294 Mo. 346, 243 S.W. 147, 152(a)(b), the other case stressed by appellant. Appellant's testimony was that he was home all day until he went to the store at Cedar Creek. The statements of witnesses Freda Clark and Lonnie Davis with regard to the time involved, when their respective testimony is read as a whole, were estimates and the jury could so find. The State's evidence, if believed, established conspiracy, motive, ill will or malice, deliberation, premeditation, preparation, presence in the vicinity and opportunity for the murder, appellant's statement that the job had been done and everything was O.K., and attempts to establish an alibi and to divert suspicion toward others. A submissible case was made.

■ Motions for new trial are to be filed "within ten days after the return of the verdict: Provided * * * the court may extend the time for filing such motion for an additional period of thirty (30) days: provided further, the court shall have no power to make another or further extension of the time for filing said motion." 42 V.A.M.S. Supreme Court Rule 27.20; § 547.030, RSMo 1949, V.A.M.S.; State v. Graves, 352 Mo. 1102, 182 S.W.2d 46, 51 [4, 5]. The jury returned its verdict on December 5, 1953. Appellant filed a motion for new trial. On March 5, 1954, approximately 90 days after the verdict, appellant filed a supplemental motion for new trial based upon alleged newly discovered evidence to the effect that one of the trial jurors had prejudged the case. On March 6, 1954, the trial court, after hearing evidence pro and con on said motion of March 5th, overruled each of said motions. Appellant's supplemental motion for new trial was a nullity, having been filed after the expiration of the time allowed by law for its filing, and the trial court was without jurisdiction to entertain said motion. State v. Brown, 339 Mo. 1014, 98 S.W.2d 777, reviewing authorities; State v. Loyd, Mo., 233 S.W.2d 658, 659 [2–4]; State v. La Breyere, 333 Mo. 1205, 64 S.W.2d 117, 118 [2–5]; State v. Mosley, Mo., 119 S.W. 2d 297 [1]; State v. Hyatt, Mo., 71 S.W.2d 711, 712 [1, 2]. It follows that prejudicial error was not committed in overruling the motion for new trial questioning the qualifications of one of the jurors.

■ Glenn Hendrix, sheriff of Greene county, testified that Ruby Cobb was in the Greene county jail for about a year following February 24, 1951. Clarence Wood was also confined there part of that

time. Carl Wood visited the jail between February 24 and October 17, 1951, nine times, and sheriff Hendrix was of opinion he visited Ruby Cobb. Appellant claims the court erred in excluding the offered testimony that Carl Wood once requested permission of witness to marry Ruby Cobb near the end of her stay at the jail. No authority is cited. There is no proof of any overt act by Carl Wood in the perpetration of the homicide. The court ruled correctly. State v. Taylor, 136 Mo. 66, 73, 37 S.W. 907, 909.

■ Instruction No. 4 submitted the issue of appellant aiding and abetting the commission of the homicide. Appellant says it was not supported by the evidence. The record shows that appellant requested the court to give said instruction, and it appears to be a defendant's instruction. The record controls and appellant, having requested the instruction, is in no position to complain. Supreme Court Rule 26.06 (1); § 545.030, subd. 1(16), RSMo1949, V.A.M.S.; State v. Ferguson, 278 Mo. 119, 212 S.W. 339, 344 [14]; State v. Nenninger, 354 Mo. 53, 188 S.W.2d 56, 58 [3–6]. The record imports absolute verity. State v. Brown, 339 Mo. 1014, 98 S.W.2d 777, 779 [5, 6]; State v. Dimmick, 331 Mo. 240, 53 S.W.2d 262, 265 [4]; State v. Tompkins, Mo., 277 S.W.2d 587. The point is disallowed.

■ Appellant complains of the refusal of his instruction to the effect that "verbal statements of the defendant" testified to "are to be received by you with great caution on account of the liability of witnesses to forget or misunderstand what was really said or intended"; citing the early cases of State v. Moxley, 102 Mo. 374, 390 (VIII), 14 S.W. 969, 973 [8], 15 S.W. 556; State v. Hendricks, 172 Mo. 654, 668, 73 S.W. 194, 199, and State v. Henderson, 186 Mo. 473, 497, 85 S.W. 576, 583.

This cautionary instruction informed the jury it should weigh the testimony as to verbal statements made by an accused "with great caution." The requested instruction appears to be an adjunct to instructions at one time approved by this court to the effect, briefly stated, that statements by an accused against his interest are presumed to be true while what he said for himself are to be treated as true or false according to the other facts and circumstances in evidence. See State v. Dollarhide, 333 Mo. 1087, 63 S.W.2d 998, 1000. In State v. Johnson, 333 Mo. 1008, 63 S.W.2d 1000, 1005, we said of a principal instruction, worded in theretofore approved form, that: "We think it also invades the province of the jury as to what weight they should give to the testimony, and should not be given." See, among others, State v. Duncan, 336 Mo. 600, 80 S.W.2d 147, 154; State v. Robertson, 351 Mo. 159, 171 S.W.2d 718; State v. Talbert, 351 Mo. 791, 174 S.W.2d 144 [1]. In the instant case the court gave the usual instruction on the credibility of the witnesses and the weight and value to be given their testimony. The refusal of instructions similar to appellant's requested instruction have been held not to constitute error. State v. Clump, 16 Mo. 385, 387; State v. Williamson, 343 Mo. 732, 123 S.W. 2d 42, 45 [7]; State v. Pope, 338 Mo. 919, 92 S.W.2d 904, 911 [19]. And see State v. Henderson, 186 Mo. loc.cit. 488(IV), 494, 495, 85 S.W. loc.cit 580, 582, 583.

The record shows an information sufficient in substance and form; the presence of appellant; the impaneling and swearing of the jury; a trial upon the information as if appellant had been arraigned and pleaded not guilty, S.Ct.R. 25.04; the return of the verdict; the filing and overruling of the motion for new trial; the according of allocution; the judgment and sentence in accord with the verdict, and the application and allowance of an appeal as a poor person. The case was tried in Christian county upon change of venue. State v. Clark, Mo., 259 S.W.2d 813. See State v. Bockman, 344 Mo. 80, 124 S.W.2d 1205, 1206 [7]. We consider the record sufficient.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

602

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

ELLISON, P. J., LEEDY, J., and BROADDUS, Special Judge, concur.

On Motion for Rehearing
or to Transfer

PER CURIAM.

 The only point presented in appellant's motion for rehearing or to transfer is that the fifth point in his brief was overlooked. The point reads: "The court erred in giving instruction No. 2 over the objection of defendant, there being no evidence in the record that the defendant entered into a conspiracy or common design for anyone else to take the life of deceased and is inconsistent with and irreconcilable with the State's theory of the case." Instruction No. 2 was to the effect that all persons are equally guilty who act together with a common purpose in the commission of a crime and the act of one of them, proceeding according to the common plan, is the act of each. In State v. Buckley, 309 Mo. 38, 274 S.W. 74, 76, the only authority cited in appellant's brief to the point, the evidence was considered insufficient to connect the defendants with the acts of the person committing the homicide. As stated in the instant opinion there was direct evidence of appellant's participation in the instant conspiracy and the Buckley case does not establish error. The State's main instruction proceeded upon the theory that deceased was killed as the result of the conspiracy; that appellant was a participant therein, and that appellant was the conspirator who actually killed deceased. The jury was not authorized to convict appellant unless they so found. Instruction No. 2 did not direct a verdict. It stated the law regarding a conspiracy to commit an offense and under the evidence the giving of the instruction was proper. 23 C.J.S., Criminal Law, § 1287, Conspiracy, page 861.

Appellant's motion for rehearing or, in the alternative, to transfer to Court en Banc is overruled.